# DAN ANDERSON v. STATE.

No. A-1307.   Opinion Filed September 14, 1912.

(126 Pac. 840.)

1.    APPEAL—Constitutional Law—Witnesses—Review—Presumptions —Briefs—Order of Trial—"Due Process of Law"—Compulsory Process for Witnesses—"Law of the Land." (a) In re McNaught, 1 Okla. Cr. 528, 99 Pac. 241, approved and reaffirmed.

(b)   The Criminal Court of Appeals never presumes error in the proceedings of a court of record. Two things must be shown by an appellant in a criminal case before a conviction will be reversed, viz., that error was committed during the trial, and that this error, unless jurisdictional, deprived the appellant of some substantial right, to his material injury.

(c)   It is the duty of counsel for an appellant, upon appeal, to file a brief in this court, stating clearly the grounds upon which they rely for a reversal. This brief must also contain an argument showing wherein the proceedings of the lower court were erroneous and how appellant was injured thereby, and should also contain a citation of the authorities upon which counsel rely.

(d)   In cases where the extreme penalty of the law is pronounced against the appellant, this court will thoroughly investigate the record and give to appellant the benefit of any material error, which may have been committed, which operated to his injury, whether the same was excepted to at the trial, or properly presented in the brief of his counsel.

(e) Where two or more defendants are jointly indicted and a severance is obtained, it is within the discretion of the trial court as to which defendant shall be tried first.

(f) The term "due process of law" is synonymous with "the law of the land"; and in criminal cases "the law of the land" necessarily means the law of the state where the offense is committed, and where the trial takes place.

(g) In criminal cases in a state court, "due process of law" means a trial in a court of competent jurisdiction, before an impartial judge and jury, or judge without a jury, upon an accusation, either by indictment or information, as the state may provide, charging the accused with the violation of some state law, of which accusation the accused must have notice in time to enable him to prepare for trial. This trial must proceed according to the established procedure or rules of practice in such state applicable to all such cases. In other words, the defendant must have his day in court. The admission of evidence for or against the accused must be according to the established rules in such state in all such cases, and the punishment inflicted must be authorized by law.

(h) The sixth amendment to the Constitution of the United States does not limit or control prosecutions in state courts; but it operates alone on prosecutions in United States courts.

(i) The provision in our Constitution, giving a defendant the right to have compulsory process for obtaining witnesses in his behalf, has nothing to do with the competency of such witnesses when presented in court.

2. EVIDENCE—Admission by Accused. The fact that a prisoner may be under arrest and in jail, and was not warned that any statement made by him might be used against him, will not in any manner affect the admissibility of any voluntary statement made by him which would otherwise be competent.

3. WITNESSES—Examination—Privilege of Witness. Where a defendant is upon trial and offers the testimony of a codefendant jointly indicted with him for the same offense, it is not error for the trial court to refuse to compel such witness to answer any question, when the witness claims that such answer will incriminate him, and declines to answer upon this ground.

4. HOMICIDE—Instructions—Applicability to Case—Sufficiency of Evidence. (a) The question of the sufficiency of the instructions and the action of the court in refusing to give special instructions requested must always be considered and determined by the facts of each case in which they arise.

(b) For testimony which sustains a verdict for capital punishment, see statement in this case.

(Syllabus by the Court.)

*Appeal from District Court, Wagoner County;*
*R. P. de Graffenried, Judge.*

Dan Anderson was convicted of murder and sentenced to death, and appeals. Affirmed.

The following is a statement of the material testimony in this case:

Ruff Gossett testified in behalf of the state: That he resided in the town of Coweta, in Wagoner county, Okla. That at the time of the homicide he was sitting on the north side of the door of his house. The first thing that attracted his attention was when the deceased, John Vannoy, attempted to enter his house. At the same time he saw appellant with a pistol in his hand, trying to shoot at deceased. Appellant fired the first shot just as deceased was attempting to enter the house. Deceased said, "Don't shoot me about my wife." Appellant made no reply to this. Just after the first shot was fired, appellant passed the door of the house of witness, accompanied by his co-defendant, Arbelle Vannoy. Witness then testified as follows:

"Q. Will you please describe how he came into your door? A. Yes, sir; he came in grabbing hold of the left side of the door, and hollowing and jumping, and the shot was made as he entered the door, and he wheeled around the door facing toward the north side, toward where I was sitting, and I jumped up and told Anderson not to shoot in my house; and he passed on down the street and got about 20 yards, and Vannoy went out, following him. He was going to get his wife, to get her to go home with him, and Anderson shot at him again about 20 steps; and when he drawed his pistol down Vannoy fell, and he missed him, and went on about 40 yards and got to a ravine and made another shot, and Vannoy dropped down in the ditch, and he missed him again. Vannoy tried to get out of the ditch, and Anderson started to shoot again, and he ducked under a little bridge crossing the ravine, and as he ducked under there Anderson shot at him and hit him in the leg, and as he came out from under the bridge he shot at him twice and missed him."

Witness knows the first shot fired by appellant hit the deceased just as the deceased entered the house of witness, as blood ran down on the floor. After appellant and Arbelle Vannoy passed the house of witness, deceased went out, saying that he wanted to get his wife to go home with him. Neither appellant nor Arbelle Vannoy made any answer to the request of deceased to have his wife go home with him, except that appellant shot

at deceased a second time, when he was about 20 yards from the door. During the shooting Arbelle Vannoy was standing by the side of Anderson. Witness did not see any weapon in the hands of deceased at the time appellant was shooting at the deceased.

J. B. Fletcher testified: That he was a practicing physician residing in the town of Coweta. That just after the shooting he saw the deceased, and found him suffering from gunshot wounds. One bullet entered at the first floating rib and ranged across his body to the top of the hip bone on the right side. The other bullet went through the left leg of deceased. Deceased died from hemorrhage, caused from the gunshot wound through his body. Deceased was shot between 6 and 7 o'clock one afternoon, and died at 7 o'clock next morning.

Dave Scott testified: That he was a barber in Joe Henderson's shop in the town of Coweta. That he remembers the occasion of the shooting of John Vannoy. That deceased passed the barber shop with his wife, Arbelle Vannoy. That appellant, Dan Anderson, was in the barber shop having his hair cut. That appellant went out to a ball game and came back to the shop about 9 o'clock, and said that some one had got shot. Witness quit work about 10:15, and went to the place and found deceased shot and suffering from a wound. Witness stayed around there a good while, and then came back to the jail and found appellant in jail. Appellant then requested witness to go back and bring Arbelle Vannoy to jail to see him. Witness went and brought Arbelle Vannoy to jail, as requested by appellant. Arbelle Vannoy asked appellant how he was feeling. Appellant answered he was felling very well. She then asked him if he needed any money. He replied: "No; I have the dollar you gave me. I don't need any more." She then said to him: "Don't worry; I will get a lawyer and get you out in the morning." She then said, "Do you need anything else?" He replied, "No, except a half pint of whisky," and she asked witness if he would go and get it for him.

Asburry Lee testified: That he resided in Coweta. That he got acquainted with deceased a few weeks before the shooting. Witness saw four shots and heard one. The first shot attracted

his attention. On looking, the first thing he saw was the appellant shooting at the deceased. He saw Arbelle Vannoy with the appellant. He heard deceased say she was his wife. Witness described the shots he saw as follows:

"A. All I saw was the shots he made. When he turned, he made a shot, and this old gentleman fell; and when he fell he got up again, and then he made another shot at him. He shot again, and then he made on and crossed the bridge south somewhere, and then he made another shot. Q. Who ran across the bridge? A. This gentleman here. Q. Call his name. A. Dan Anderson. Q. What happened after that? A. After he went across the bridge there, this old gentleman went down to the bridge, and as he started to make to the south he jumped into the ditch. Q. Who? A. John Vannoy. And when he jumped into the ditch he made another fire, and as he shot that shot the old gentleman fell, and he went to shoot down upon him again, and that was the last shot. Q. After that last shot, what did the defendant, Dan Anderson, do? A. Started like he was going south, running, and came back to me, toward my house, and jumped over the fence there, where there was some jimpson weeds, reloaded his gun, and looked like he come to himself, and broke across the field south and went around the lot there, and then taken south. Q. Did he say anything while he was there? A. Never heard him say one word. Q. How far away was he when he looked like he was loading his gun? A. About 50 yards. Q. Did you see what became of his woman, Vannoy? A. She went to a lady's house by the name of Maloney, and then came back to my house and said, 'Don't let him hurt me.'"

Deceased did not have any weapon in his hand during the shooting that the witness could see.

Mary Lee testified for the state: That she lived in the town of Coweta. That she was the wife of Asbury Lee. She then testified as follows:

"Q. Tell us about the shooting. Just go ahead in your own words and tell us about the shooting. A. I was in the kitchen cooking supper, and I heard the shots, and my old man run out to see what it was, and this man, Dan Anderson, and that lady were running down the road. Q. Whom do you mean by that? A. Anderson and this lady over there. Q. Which one do you mean? A. That one with the pink on (indicating the defendant Arbelle Vannoy). Q. Arbelle Vannoy? A. I know that is the name. I never noticed her, but that is the one. Q.

Who else was running down the road besides these two? A. Her husband. Q. John Vannoy?· A. Yes, sir; and when I got out of the house I saw him fall down. And when I asked, 'What is the matter?' the old man went down, and he got up and come on down to the bridge, and they had crossed the bridge—Anderson and Arbelle Vannoy. And when he got to the bridge he fell, and he was crawling under the bridge, and Anderson fired and shot at him two or three times, and while he was under the bridge, and John Vannoy begged him, 'Don't shoot me no more,' and about that time he ran off. Q. Who said, 'Don't shoot me no more?' A. John Vannoy. Q. Where was he? A. Crawling under the bridge. Q. Who was he talking to? A. Talking to Anderson. He was the only man there, and this woman, his wife. Q. Whose wife? A. Vannoy's. He said, 'Don't shoot me any more.' I did not know who he was at that time. Q. What then happened? A. He ran off—Anderson—and Arbelle came to my house after that."

Virgil Hurt testified: That he arrested the appellant, who admitted to him that he had done the shooting. He told witness where he (appellant) had hid the pistol. Witness went and found the· pistol in the place described by appellant.

Randall Aytche testified: That on the day of the killing he met the· deceased and his wife in the town of Coweta. Witness also saw appellant about the same time. Appellant was then about˙three feet from deceased and his wife. That he heard appellant say: "I will kill him. God damn him, I will kill him." 

John Aytche testified: That he witnessed the shooting in which deceased lost his life. That the shooting was done by appellant. That witness saw deceased and his wife in the town of Coweta. They were coming down the streets of the town. Appellant was behind them. Deceased grabbed his wife's purse and said, "Let's go home to the children," and she snatched loose and said, "You had better not hit me." Appellant was about 40 feet behind them. "He sorter stooped and snatched out his gun and shot deceased as he jumped in the door." All that deceased had done had been to grab the purse of his wife and say, "Let's go home to the children." Appellant did not say anything. He simply pulled out his gun and shot deceased as he went into the house. When appellant pulled his gun, deceased saw it and tried to run into the house. Deceased did not have

any weapon in his hands. Witness then proceeded to testify as follows:

"A. He fired one when he went in the door, and Dan Anderson ran down the road, and Vannoy run back out—and shot at him again, and he missed him. Q. After that first shot, what did Anderson do? A. He ran down the road. Q. Which way? A South. Q. What did John Vannoy do? A. He ran back out in the street again. Q. While this was going on, where was the woman? A. She broke west and dropped her hat, and turned around and started towards Anderson. Q. When they ran down the road, who was in the lead? A. She was. Q. The woman? A. Yes, sir. Q. Where was Vannoy then? A. He was out in the street, coming on behind. Q. Who was second? A. Dan Anderson. Q. Was anybody behind Dan Anderson? A. Mr. Vannoy was behind, following him. Q. Now, where was the second shot fired? A. A little below Mr. Gossett's house. Q. How far was Anderson from John Vannoy then? A. He was close to the spring, and Mr. Vannoy was a little past Gossett's house. Q. Did Mr. Vannoy have anything in his hands then? A. No, sir; did not have anything. Q. Did you see any more shots? A. I never seen but the one more. Q. Where was that? A. He shot Mr. Vannoy; shot at him and missed him, and the bullet come by me. Q. What did you do then? A. I ran back into the back yard. Q. In whose back yard? A. In our back yard."

Alsa Aytche testified in behalf of the state that she resided in the town of Coweta. She then testified as follows:

"A. I was standing there counting the chickens, and Gossett's house was right out there, and this lady and her husband— Q. This lady, Arbelle Vannoy, and what was her husband's name? A. Yes, sir; and her husband's name was John Vannoy. Q. Now go ahead. You say you saw them. What happened after that? A. John catched Arbelle by the hand or pocketbook, and she jerked aloose and said, 'Don't you hit me,' and John said: 'You are going home to the little children. You have been away for six weeks.' Q. Where was Anderson? A. Standing a piece from them. Q. Which way? A. Gant's house sets this way, and Dan was this way. Q. How far away? A. Not very far. Q. About how far? A. I do not know exactly. Q. Was he as far as that wall? A. About as far as to that gentleman there. Q. About how many feet was that? A. About three feet I reckon (indicating about 15 feet). Q. Are you sure about that? A. I guess so. Q. Ever been to school? A. Yes,

sir; been there six or seven months. Q. You have told some conversation or words that was said there. Now, was there anything more said? You said that the old man, John Vannoy, spoke to his wife. After that, what was done; what was said? A. Nothing more. This gentleman run up there and went— Q. Who? A. Dan Anderson run up, and this man turned loose and started in the door, and Anderson shot him. Q. Whom did Anderson shoot? A. John Vannoy. Q. Did this defendant, Anderson, say anything to Vannoy before he shot him? A. No, sir; never heard anything. Q. Did Vannoy say anything to the defendant, Anderson? A. No, sir. Q. Now, Alsa, did John Vannoy have anything in his hands? A. No, sir; he said he did not have even a pocketknife. Q. Where was John standing when Anderson shot him? A. Going into Gossett's house. Q. Which way does the house face? A. His house was right there on the street, and my house was there. Q. You know which is east and west? A. Yes, sir. Q. Which way does Ruff Gossett's house face; which way does the door face? A. The door is that way, right straight this way. Q. How far was Dan Anderson from Vannoy when he shot him? A. As close as I am to you. Q. You hear the defendant, Anderson, say anything? A. No, sir. Q. At the time of the shooting? A. No, sir." Q. Did you hear Vannoy say anything at the time of the shooting? A. No, sir; only what he said before, about telling her to come on and go home to the children. Q. Had John Vannoy— First, I will ask you, when John Vannoy was in the door of Ruff Gossett's house after that shot, what became of Anderson? A. He ran on down the road. Q. How many times did Anderson shoot? A. I do not know how many times. I did not count them. He shot back once after he ran off, and after he got down to the bridge turned around and shot. I do not know how many times he shot. Q. Where was the first shot he fired? A. At Gossett's. Q. Was there a second shot? A. Yes, sir; when he ran off down the road. Q. How did he come to shoot then? A. He just ran off, and that man Vannoy he came out, and it looked like he kept following him, and he just turned around and just shot back, and then he went on. Q. When Dan Anderson shot the second time, where was that woman, Arbelle Vannoy? A. She was going on down the road, and Anderson went after her. Q. Did you hear anything said then? A. No, sir. Q. After the second shot you have described, did you see any more shots? A. I seen them; but I was at my house, and they were at the bridge. I seen the fire. I did not go down there. Q. Could you distinguish where the men were; where the defendant was

and the man, Vannoy? A. I could see them about the bridge, a little piece off from there; could see down there where they were. Q. Where was John Vannoy at that bridge? A. He was down there. Q. Do you know what his position was? A. No, sir. Do you know where he was down there with reference to the bridge? A. No, sir; I could not. I know he was down there. Q. Did you see where the woman went? A. Yes, sir; she went there too. Q. You see where Anderson went? A. Saw him going across the field down there after that. Q. At the time of this shooting and the difficulty, did you see anything in Vannoy's hands? A. No, sir; not a thing."

William Combs testified in behalf of the state: That he resided in the town of Coweta. That he saw a little of the difficulty in which the deceased was killed. He heard some shots, and went out to see where they came from. He then testified as follows:

"A. Why, the nigger that was doing the shooting, he was in the road, and this other nigger that got shot was down by a little bridge. Q. What was he doing there? A. Looked like he was trying to get under the bridge. Q. Did you know any of the niggers? A. No, sir. Q. Recognize any of them? A. No, sir. I saw the nigger as or after he was shot. Q. You mean the man that was shot? A. Yes, sir. Q. That was the man that was shot. Who was he? A. Vannoy. Q. You know Vannoy? A. No, sir. Q. Did you see the man after he was shot? A. Yes, sir. Q. How many shots did he fire? A. Well, somewhere about five shots. Q. How many shots you see fired? A. I believe something like three. Q. Can you just describe where the parties were and the circumstances of those three shots you saw fired? A. The fellow that was doing the shooting was out in the road, kinder southeast of the fellow that was shot at, and the fellow he was shooting at was down under; that is, when he made the first shot, he tripped under and fell, and then he shot at him again as he got up. Q. Then what happened? A. It seems like the fellow that was doing the shooting ran up and shot and ran off down the road. Q. What became of the man that was shot? A. He then got up and came on toward the way the fellow ran off, and then he came back and went off west to where old man Lee lives. Q. You saw anybody else right there at that time? A. A nigger woman was down there. Q. Where did she go? A. Went over west to old man Lee's. Q. Did you know that woman? A. No, sir. Q. You ever see her before that day? A. No, sir. Q. When these two were over at Lee's, where did

the man that was doing the shooting go? A. Why he went kinder southwest down the road. I did not see him any more."

Fannie Maloney, as a witness for the state, testified: That she resided in the town of Coweta. That she heard the report of the gun and went out and saw appellant. She then testified as follows:

"A. He was shooting. Q. Where was he when he was shooting? A. He was on the north side of the bridge, and I seen him come on the south side. Q. At whom was he shooting? A. John Vannoy. Q. How many shots did you see? A. I only seen two. Q. When you saw the two shots, where was John Vannoy standing, and where was this defendant standing? A. I said the first shot they were both on the north side of the bridge. Q. How far is that from your house? A. I do not know. I guess 25 feet, I reckon. Q. Were you close enough —did you hear them say anything? A. No, sir. I heard the old man say, the last fire that was made, told the boy not to shoot him any more. That was when he was under the bridge. Q. Was there anybody else there beside Anderson and Vannoy? A. Yes, sir. Q. Who? A. Arbelle Vannoy. Q. Where was she? A. She was on the south side of the bridge. Q. On the south side of the bridge? A. Yes, sir. Q. How close was she to the defendant, Dan Anderson, when he was doing the shooting? A. I do not know how close she was. Q. Can't you indicate? A. She might have been about 10 feet from that gentleman sitting there."

George Robertson testified in behalf of the state: That he knows appellant. That appellant came to Coweta on the morning of the killing. That deceased and his wife were on the train with him. That witness saw deceased and appellant talking. That witness afterwards saw appellant talking with Arbelle Vannoy. Witness saw John Vannoy after he was shot. That he had a conversation with him. Deceased said he was feeling awfully bad, and that he was going to die. Witness asked deceased what he had. Deceased replied, "Not a living thing."

J. J. Hughes testified: That he had a conversation with the deceased after he was shot. Deceased said he thought he would die. That deceased's mind was clear, and he was perfectly conscious. That deceased made a dying statement, which was reduced to writing by the stenographer, and the notes tran-

scribed next morning. This statement was read to the deceased after it was written down, and deceased consented to its correctness and requested certain parties to sign the same as witnesses.

Polly Cook, a witness for appellant, testified: That she was a sister of Arbelle Vannoy. That appellant had stayed last year at John Vannoy's, working on his farm. That appellant left John Vannoy five or six weeks before the killing. That after appellant left the home of John Vannoy Arbelle Vannoy left, and was absent about a month.

Appellant took the stand as a witness in his own behalf. He testified that his home was in Granberry, Tex. That he had been in Oklahoma a year before the killing. That he lived at the home of John Vannoy, who was his uncle. That appellant could not get along with John Vannoy and left his house, and finally went down in Texas. That appellant saw deceased and his wife in Coweta the afternoon of the killing. He called to them to stop. Deceased called back: "You black son of a bitch, you sold my land." Appellant was then about two feet behind deceased. Deceased then wheeled around and said: "You black son of a bitch, I am going to kill you anyhow." Deceased then ran at appellant, and appellant grabbed his gun and shot deceased. That appellant then broke and ran down the road. That the deceased followed him. That he turned around and shot the deceased again. Appellant kept on running, because he was afraid of deceased. That on the morning of the difficulty the deceased threatened to kill appellant, and appellant heard from other parties that deceased had threatened to kill him. On cross-examination appellant testified that he first met the wife of deceased at the home of her husband about a year before the killing. That after appellant returned to Texas he received a letter from Arbelle Vannoy which included money. She wanted appellant to return to Oklahoma and be a witness in a land case. That appellant returned to Oklahoma as soon as he received the letter. The letter contained $10. That appellant met Arbelle Vannoy in Luther, Okla., to see about some land business. Her husband was not present.

Will Hines testified in behalf of appellant: That his wife was a sister of Arbelle Vannoy. That he had been acquainted with appellant about a year and eight months. That witness saw appellant in Tulsa and warned him not to come back, because deceased had threatened to kill him. He further testified as to the general reputation of the deceased in the community in which he resided, and that he was regarded as being a dangerous man and habitually carried a gun.

Pinkney Hines testified in behalf of appellant: That she was the wife of Will Hines. That appellant had lived with deceased. That she was a sister of the wife of John Vannoy; that the day before the killing she heard the deceased threaten to kill the appellant.

Henry Cook testified for the appellant: That he married the sister of Arbelle Vannoy, and that he lived within two miles of the deceased, John Vannoy. That the deceased was a farmer. That he had known appellant a little more than a year. That appellant lived with Vannoy during the preceding year and made a cotton crop on his farm. That Arbelle Vannoy and appellant were at the home of John Vannoy about a month before the killing. During this time witness saw the deceased, John Vannoy. That deceased was at the house of witness, and witness heard deceased say that he was going to kill appellant. Witness heard deceased say this three or four times before the killing. That deceased was a large man, and weighed about 200 pounds. He was about six feet tall. That he was a very strong and active man. That appellant is a small man, weighing about 140 pounds. That the reputation of deceased as being a quarrelsome, violent, and dangerous man was bad.

Will McFarland testified for appellant: That he was a brother-in-law of the deceased, John Vannoy. That the year before the killing appellant lived with Vannoy on his farm. That he heard deceased say that he was going to kill appellant. That the general reputation of John Vannoy in the community in which he lived as being a peaceable, quiet, law-abiding man was bad

*Dick Oxford, J. S. Dickey, J. J. Hughes,* and *John Davenport,* for appellant.

*Smith C. Matson,* Asst. Atty. Gen., and *E. M. Gallaher,* Co. Atty., for the State.

FURMAN, P. J. (after stating the facts as above). The petition in error sets out 23 grounds upon which it is alleged that the judgment of the trial court should be set aside and a new trial be granted. This was a joint prosecution against appellant, Dan Anderson, and Arbelle Vannoy for the murder of John Vannoy. When the case was called for trial, appellant, Dan Anderson, filed a motion for severance, which was granted by the court. Appellant then demanded that Arbelle Vannoy should be tried first. The demand was refused, and appellant excepted to the ruling of the court. Appellant was placed upon trial and found guilty of murder, and his punishment was assessed at death.

First. Counsel for appellant in their brief say:

"Defendant assigns that the court erred in compelling him to be tried first, after granting a severance, thereby depriving him of the evidence of his codefendant, Arbelle Vannoy.

"Article 5, Constitution of the United States, as amended, among other things, provides that 'no person shall be deprived of life, liberty, or property without due process of law.'

"Article 6, Const. U. S., as amended, among other things, provides that in all criminal prosecutions the accused shall enjoy the right to have compulsory process for obtaining witnesses in his favor.

"Article 14, Const. U. S., among other things, provides that 'no state shall deprive any person of life, liberty or property without due process of law; nor deny to any person the equal protection of the laws.'

"Article 2, sec. 7, Const. Oklahoma, provides that 'no person shall be deprived of life, liberty or property, without due process of law,' and in section 20, same article, among other things, provides that 'in all criminal prosecutions the accused shall have compulsory process for obtaining witnesses in his behalf.' "

If counsel for appellant had carefully considered the very able opinion of Judge Doyle, in the case of *In re McNaught,* 1

Okla. Cr. 528, 99 Pac. 241, we do not believe that they would have presented this question. In McNaught's case the question was as to whether a prosecution for murder by information constituted due process of law. We there held that it did. While our discussion was confined to the question there presented, yet the principles announced are decisive of the question now presented to us. But, as this matter has come up again, we will take a broader view and see just what due process of law means. That a state cannot deprive a person of life, liberty, or property, without due process of law, goes without the saying. It is not only embodied in the Constitution of the United States and of this state, but it is a fundamental principle of justice, independent of either Constitution. As we understand it, the assumption of counsel for appellant is that the refusal of the trial court to place his codefendant, Arbelle Vannoy, on trial first deprived him of an opportunity of securing her evidence as a witness in his behalf, and thereby amounted to a denial to appellant of due process of law. But counsel for appellant did not attempt to discuss the question as to what constitutes due process of law, or favor us with either argument or authorities in support of the contention that placing appellant upon trial first amounted to a denial of due process of law; but they assumed the proposition in controversy, and substituted assertion for argument and authorities. We would therefore be at liberty to disregard and ignore this proposition altogether, because it is no part of the duty of this court to brief cases, as well as decide them. This court never presumes error in the proceedings of a court of record. Two things must be shown by the appellant before a conviction will be reversed, viz., that error was committed during the trial, and that this error, unless jurisdictional, deprived the appellant of some substantial right, to his material injury. Unless such error is properly presented in the brief, a conviction will be affirmed. See *Price v. State,* 5 Okla. Cr. 147, 113 Pac. 1061. But, as the extreme penalty of the law has been pronounced against appellant, we feel it to be our duty to thoroughly investigate the record, and to give appellant the benefit of any material error that may have been committed which operated to

his injury, whether or not the same was excepted to at the trial, or properly presented in the brief. See *Vickers v. United States,* 1 Okla. Cr. 452, 98 Pac. 467; *Turner et al. v. State,* 126 Pac. 452, decided at the present term.

In the consideration of this matter, the first question which presents itself is, What constitutes due process of law? In the case of *Dartmouth College v. Woodward,* 4 Wheat. 518, 4 L. Ed. 629, the Supreme Court of the United States declared that by due process of law was meant "a law which hears before it condemns; which proceeds upon inquiry and renders judgment only after trial." 2 Kent's Commentaries, p. 10, declares that due process of law means law in its regular course of administration through courts of justice. The Supreme Court of New York, in the case of *Taylor v. Porter,* 4 Hill, 140, 40 Am. Dec. 274, declares that by due process of law is meant a prosecution or suit instituted and conducted according to the prescribed forms and solemnities for ascertaining guilt or determining title of property. Mr. Cooley, in his work on Constitutional Limitations, sec. 356, says that due process of law in each particular case means such an exertion of the powers of government as the settled maxims of law permit and sanction, and under such safeguards for the protection of individual rights as those maxims prescribe for the class of cases to which the one in question belongs. In the case of *Murray v. Hoboken Land Co.,* 18 How. 272, 15 L. Ed. 372, the Supreme Court of the United States declared that "due process of law" is synonymous with "the law of the land." "The law of the land" necessarily means the law of the state where the offense is committed, and where the trial takes place. The prohibition of the federal Constitution cannot mean that a state must observe the due process of law of some other jurisdiction over which it has no control. It has accordingly been repeatedly declared that the phrase "due process of law," within the provision of the Constitution restraining the depriving of a person of his liberty without due process of law, does not of itself require a trial by jury in states where the usage and statutes are otherwise. *Montana v. St. Louis Mining & Milling Co.,* 152 U. S. 160, 171, 14 Sup. Ct. 506, 38 L.

Ed. 398; *Hurtado v. California,* 110 U. S. 516, 4 Sup. Ct. 111, 292, 28 L. Ed. 232; *Walker v. Sauvinet,* 92 U. S. 90, 93, 23 L. Ed. 678; *In re Dowell,* 169 Mass. 387, 47 N. E. 1033, 1034, 61 Am. St. Rep. 290; *Garnett v. Jennings,* 44 S. W. 382, 383, 19 Ky. Law Rep. 1712; *State v. Wilson,* 121 N. C. 425, 28 S. E. 554, 557; *Attorney General v. Jochim,* 99 Mich. 358, 58 N. W. 611, 614, 23 L. R. A. 699, 41 Am. St. Rep. 606; *Cummins v. Cummins,* 1 Marv. (Del.) 423, 31 Atl. 816, 819; *McInerney v. City of Denver,* 17 Colo. 302, 29 Pac. 516, 519; *Fant v. Buchanan* (Miss.) 17 South. 371.

In the case of *Hurtado v. California,* 110 U. S. 516, 4 Sup. Ct. 111, 292, 28 L. Ed. 232, Mr. Justice Matthews, speaking for the United States Supreme Court, says:

"It follows that any legal proceeding in force by public authority, whether sanctioned by age and custom, or newly devised, in the discretion of the legislative power, in furtherance of the general public good, which regards and preserves these principles of liberty and justice must be held to be due process of law."

In the case of *In re Kemmler,* 136 U. S. 448, 10 Sup. Ct. 934, 34 L. Ed. 519, Mr. Chief Justice Fuller said:

"Undoubtedly the amendment forbids any arbitrary deprivations of life, liberty, or property, and secures equal protection to all, under like circumstances, in the enjoyment of their rights, and in the administration of criminal justice requires that no different or higher punishment shall be imposed upon one than is imposed upon all for like offenses. But it was not designed to interfere with the power of the state to protect the lives, liberty, and property of its citizens, and to promote their health, peace, moral education, and good order. *Barbier v. Connelly,* 113 U. S. 27 [5 Sup. Ct. 357, 28 L. Ed. 923]."

In the case of *State ex rel. Wyatt v. Ashbrook,* 154 Mo. 375, 55 S. W. 627, 48 L. R. A. 265, 77 Am. St. Rep. 765, the Supreme Court of Missouri said:

"And if 'due process of law' is to be defined as 'the law of the land,' designed to protect and preserve the rights of the citizen against arbitrary legislation, as well as against arbitrary executive or judicial action, then 'due process of law' is denied when any particular person of a class or of the community is singled out for the imposition of restraint or burdens not im-

posed upon and to be borne by all of the class, or of the community at large; unless the imposition or restraint be based upon existing distinctions that differentiate the particular individuals of the class to be affected from the body of the community; and this question as to whether the persons thus designated constitute a natural or reasonable class depends upon the validity or invalidity of the legislation the Legislature must determine upon."

An entirely satisfactory definition of "due process of law," which would be applicable to and include all cases alike, cannot be easily stated. In criminal cases in a state court, "due process of law" means a trial in a court of competent jurisdiction before an impartial judge and jury, or before a judge alone, upon an accusation, either by indictment or information, as the state may provide, charging the accused with the violation of some state law, of which accusation the accused must have notice in time to enable him to prepare for trial. This trial must proceed according to the established procedure or rules of practice in such state applicable to all such cases. In other words, a defendant must have his day in court. The admission of evidence for or against the accused must be according to the established rules in such state in all such cases, and the punishment inflicted must be authorized by law.

Let us now apply these principles to the question in hand. Our statutes upon this subject are as follows (Comp. Laws 1909):

"Sec. 6830. When two or more defendants are jointly indicted for a felony, any defendant requiring it must be tried separately. In other cases defendants jointly prosecuted may be tried separately or jointly, in the discretion of the court.

"Sec. 6831. When two or more persons are included in the same indictment, the court may, at any time before the defendants have gone into their defense, on the application of the county attorney, direct any defendant to be discharged from the indictment, that he may be a witness for the state.

"Sec. 6832. When two or more persons are included in the same indictment, and the court is of opinion that in regard to a particular defendant there is not sufficient evidence to put him on his defense, it must, before the evidence is closed, in order that he may be a witness for his codefendant, submit its

opinion to the jury, who, if they so find, may acquit the particular defendant for the purpose aforesaid."

What was the law before these statutes were enacted? Mr. Justice Story, in *U. S. v. Marchant,* 12 Wheat. 480, 6 L. Ed. 700, answers this question as follows:

"Where two or more persons are jointly charged in the same indictment with a capital offense, they have not a right, by law, to be tried separately, without the consent of the prosecutor; but such separate trial is a matter to be allowed in the discretion of the court."

In the body of the opinion the court examines the alleged right at some length, and concludes that it has "not merely the absence of any authority in favor of the matter of right, but the course of practice." In later cases before the Supreme Court of the United States this decision is followed, and today in the federal courts codefendants have no absolute right of severance; but this matter is addressed to the sound discretion of the court. Of course, the question does not arise as to the order of trial, since there is no right of severance at common law; but this matter, if controlled by the court in its discretion, it naturally follows that the order of trial is within the sound discretion of the court. So extensive is this discretion that in a case where there were three defendants, and in a motion for severance, two of the defendants alleged that (1) the third defendant had been previously acquitted; (2) because the government relied on his acts and declarations made after the killing, and not in their presence or hearing; (3) because he was a material witness in their behalf. Upon this hearing, similar in all respects to the motion in the case at bar, the motion was overruled, and the Supreme Court, in the case of *United States v. Ball,* 163 U. S. 662, 16 Sup. Ct. 1192, 41 L. Ed. 300, follows the decision of Justice Story, already referred to, in these words:

"But the question whether defendants jointly indicted should be tried together or separately was a question resting in the sound discretion of the court below."

Unless altered by statute, the rule is universal that where separate trials are granted on a joint indictment, as well as where several are separately indicted for the same offense, the prosecu-

tion may determine the order in which they shall be tried. *Jones v. State,* 1 Ga. 610; *Patterson v. People,* 46 Barb. (N. Y.) 625; *State v. Nash,* 7 Iowa, 347; *People v. McIntyre,* 1 Parker Cr. R. (N. Y.) 371; *Shay v. Commonwealth,* 36 Pa. 305; *State v. Crank,* 2 Bailey (S. C.) 66, 23 Am. Dec. 117.

In *State v. Crank,* 2 Bailey, 66, 23 Am. Dec. 117, decided in 1831 by the Supreme Court of South Carolina, the following is in the syllabus:

"The state has the right to elect which of two prisoners jointly indicted, severing in their defense, shall be first tried."

In *Jones v. State,* 1 Ga. 610, decided in 1846, we find the following:

"On an indictment against several defendants, where separate trials are granted, the court will not control the discretion of the district attorney as to which of the defendants shall be first tried."

Following this, in 1852, in *People v. McIntyre,* 1 Parker Cr. R. (N. Y.) 371, the court said:

"The statute secures to persons jointly indicted for a felony the right of separate trials, but does not give them the right to regulate the time or order of such trials. The public prosecutor controls and directs on these matters, subject to the discretion of the court in cases calling for interference; and such discretion would not be the subject of review on exceptions."

In *Allison v. State,* 14 Tex. App. 402, decided in 1883, the Court of Criminal Appeals, second in ability to none, and noted for its strict enforcement of the technical rights of a defendant, says:

"A defendant has no right to demand that other defendants, separately indicted for the same offense, be first placed upon trial."

It is true that the Legislature of Texas did subsequently enact a statute granting this right, thus sustaining our position that this matter, when not controlled by statute, is in the discretion of the court. In Texas and in Arkansas the statutes permit defendants jointly indicted, who have taken a severance, to select the defendant who will be tried first. This would be due process of law in Texas and in Arkansas; but we have no such statute in Oklahoma. Therefore the Texas and Arkansas rule

is not applicable here. Under our statute, where two or more defendants are jointly indicted and a severance is taken, or where they are separately indicted, it is in the discretion of the court as to which shall be tried first. We therefore hold that the refusal of the court to place Arbelle Vannoy on trial first did not deprive appellant of due process of law, and that such ruling is not subject to review in this court.

It was earnestly insisted in oral argument that, as the sixth amendment to the Constitution of the United States provides that in all criminal prosecutions the accused shall have compulsory process for obtaining his witnesses, and as the same provision is found in the Constitution of this state, the court should have compelled the trial of Arbelle Vannoy first, in order that appellant might secure her testimony on his trial. So far as the sixth amendment to the Constitution of the United States is concerned, it was never intended to limit or control prosecutions of the state governments in respect to their own people, but to operate on the national government alone. This was decided more than half a century ago, and that decision has been steadily adhered to since. See *Barron v. Baltimore,* 7 Pet. 243, 247, 8 L. Ed. 672; *Livingston v. Moore,* 7 Pet. 469, 552, 8 L. Ed. 751; *Fox v. Ohio,* 5 How. 410, 434, 12 L. Ed. 213; *Smith v. Maryland,* 18 How. 71, 76, 15 L. Ed. 269; *Withers v. Buckley,* 20 How. 84, 91, 15 L. Ed. 816; *Pervear v. Commonwealth,* 5 Wall. 475, 479, 18 L. Ed. 608; *Justices v. Murray,* 9 Wall. 274, 278, 19 L. Ed. 658; *Edwards v. Elliott,* 21 Wall. 532, 557, 22 L. Ed. 487; *Walker v. Sauvinet,* 92 U. S. 90, 23 L. Ed. 678; *United States v. Cruikshank,* 92 U. S. 542, 552, 23 L. Ed. 588; *Pearson v. Yewdall,* 95 U. S. 294, 296, 24 L. Ed. 436; *Davidson v. New Orleans,* 96 U. S. 97, 101, 24 L. Ed. 616; *Kelly v. Pittsburg,* 104 U. S. 78, 26 L. Ed. 658; *Presser v. Illinois,* 116 U. S. 252, 265, 6 Sup. Ct. 580, 29 L. Ed. 615.

So far as the provision contained in our Constitution is concerned, a different question is presented. The constitutional provision is that "in all criminal prosecutions the accused shall have compulsory process for obtaining witnesses in his behalf." This only extends to the accused the right to have compulsory process

for his witnesses. It has nothing to do with the competency of such witnesses when presented, and in no manner binds the state to assist in removing any disability on the part of the witnesses for a defendant. If the position assumed by counsel for appellant is correct, it would be within the power of persons to be tried for crime to empty our jails and penitentiary by having prisoners· confined therein. summoned as witnesses for the defense, and this could be done by "due process of law." Admit their premises, and this conclusion would be inevitable. If the contention of counsel for appellant is true, then this appellant should not have been tried until after the case against Arbelle Vannoy had been tried and finally disposed of, which might have resulted in an indefinite continuance of the case against appellant. Suppose that two or more defendants are jointly indicted, each of whom demands a severance and requests that the other be tried first, if the contention of counsel for appellant is true, then neither of such defendants could ever be tried, because each would have the right to have his case continued until the competency of his codefendant as a witness in his behalf had been established. Without disrespect to counsel for appellant, there is absolutely nothing in their contention. It simply shows to what desperate extremities lawyers are sometimes reduced in attempting to save and protect guilty men. It also shows how necessary it is for courts to go to the bottom of all questions presented. If lawyers would seriously consider the questions they present and examine the authorities upon which they rely, and would brief them carefully before their cases are submitted, they would relieve this court of a vast amount of unnecessary labor and greatly aid the court in disposing of the business before it. We do not object to doing the work, and always take great pleasure in the investigation of any legal question submitted to us for decision; but, owing to the crowded condition of our docket and the further fact that we are already worked to the limit of human endurance in deciding questions properly briefed, we feel that justice to the state requires that our time should not be taken up in investigating questions which have not been properly briefed. We are therefore forced to give scant attention to ques-

tions which have not been properly briefed, unless the error is manifest and fundamental, or unless the case is one of first magnitude.

Second. Counsel for appellant did not attempt, in their brief or oral argument, to present their second assignment of error. It has therefore been abandoned. But, as this is a capital case, we have examined the record, and find that the second assignment of error is without merit. It will therefore not be discussed.

In their brief counsel group their third, fourth, and fifth assignments of error together and say:

"We think the court erred in permitting the witness Dave Scott to testify, over objection of defendant, to conversations between the defendant and the witness and Arbelle Vannoy at the jail in Coweta, Okla., several hours after the killing, and while the defendant was in jail, under arrest, and charged with the killing, had not been warned, and was under duress."

This would have been a good objection in Texas, where counsel for appellant live; but it is not good in Oklahoma. The fact that appellant was under arrest and in jail, and had not been warned, is utterly immaterial where it appears that the conversation was voluntary on his part, and was otherwise competent. The evidence was material as tending to show a motive on the part of the appellant to kill the deceased. Arbelle Vannoy was the wife of the deceased. The record conclusively established the fact that illicit relations had existed between appellant and said Arbelle Vannoy, and the theory of the state was that the homicide in this case grew out of and was the result of such illicit relations existing between appellant and said Arbelle Vannoy. From the days of King David and Uriah, there has been no more prolific cause of murder than illicit love.

The sixth assignment of error is utterly without merit, and need not be discussed.

The seventh, eighth, and ninth assignments of error have been abandoned, and are without merit.

Third. The tenth assignment of error is that the court erred in not compelling appellant's codefendant, Arbelle Vannoy, to testify in his behalf. When this witness was placed upon the

stand by appellant, she declined to testify, upon the ground that she was also indicted for the offense for which the appellant was then upon trial. The record discloses the following touching this matter:

"Whereupon Mr. J. S. Dickey, counsel for the codefendant, Arbelle Vannoy, objected to the court compelling the codefendant, Arbelle Vannoy, testifying in the case, as she was charged jointly with the defendant for the crime of murder of her husband, the deceased, as her testimony might prejudice her defense when she was tried upon the charge. Whereupon the court ordered the defendant Arbelle Vannoy to be sworn as a witness in the case and to take the stand. Whereupon Arbelle Vannoy was duly sworn according to law, and testified as follows, to-wit:

"Direct Examination of Arbelle Vannoy.

"By Oxford: Q. What is your name?

"By the Court: Q: Are you the Arbelle Vannoy that is charged in this same information of the murder of John Vannoy? A. Yes, sir.

"Judge de Graffenried: The court desires to instruct you that you cannot be compelled by the defendant to testify to any facts in connection with this killing which would incriminate, or tend to incriminate, you of the murder of John Vannoy. In case you should be asked a question, the answer to which would incriminate, or tend to incriminate, you of the murder of John Vannoy, you have a good constitutional right to refuse to answer that question."

Appellant's counsel then asked said witness a number of questions, all of which she declined to answer, upon the ground that it would incriminate her, and appellant excepted to the action of the court in declining to force said witness to answer such questions. Did the court err in this ruling? This matter is discussed very fully by a great many authorities, and we may well begin with Wigmore, vol. 4, section 2270, under the heading "Who may Claim the Privilege—Party, Witness, Counsel—Effect of Erroneous Compulsion:

"The privilege is that of the person under examination, and, like all other privileges, is intended for his protection only; consequently it does not concern a right of the party calling him."

In *Burr's Trial,* Robertson's Report, 1, p. 243, Marshall, C. J., said:

"When a question is propounded, it belongs to the court to consider and decide whether any direct answer can implicate the witness. If this be decided in the negative, then he may answer it without violating the privilege which is secured to him by law. If a direct answer to it may criminate himself, then he must be the sole judge of what his answer be. The courts cannot participate with him in this judgment, because they cannot decide on the effect of his answer without knowing what it would be; and a disclosure of that fact to the judge would strip him of the privilege which law allows and he claims."

This word from the authority of Wigmore, quoting Chief Justice Marshall, who decided the case referred to in 1807, is without doubt a settlement of the question.

In the case of *State v. Edwards,* 2 Nott & McC. 13, 10 Am. Dec. 557, a South Carolina case, we find:

"It is for the witness and not the court to judge whether his answer to a question will tend to criminate him. If it will form one link in the chain of testimony against him, he is not bound to answer; and the court should so instruct him as to enable him to decide understandingly."

In 1890, Mr. Justice Mitchell, in the case of *State v. Thaden,* 43 Minn. 253, 45 N. W. 447, said:

"After consideration of the question and an examination of the authorities, our conclusion is that the best practical rule is that laid down in some of the English cases and adopted and followed by Chief Justice Cockburn in *Reg. v. Boyes.* To this we would add that, when such reasonable apprehension of danger appears, then, inasmuch as the witness alone knows the nature of the answer he would give, he alone must decide whether it would criminate him. This, we think, is substantially what Chief Justice Marshall meant by his statement of the rule in the Burr trial."

Wigmore, in volume 4, section 2271, approves this in the following words:

"The summing up of Mr. Justice Mitchell leaves nothing to be added, and ought to remain the last word on the development of the rule."

It is undoubtedly the better practice for the court to warn the witness as to the constitutional right not to incriminate.

In *Davis v. State*, 122 Ga. 564, 50 S. E. 376, we find the following:

"The better practice is not only to notify a witness that he will not be compelled to testify to anything that will criminate him, but also, when a particular question is asked, to warn him that the answer to such question might have that effect; and especially is this true where the witness belongs to an ignorant class."

This case exactly fits the case at bar. A negro woman, ignorant in all things, is warned by the court that she has a constitutional right to refuse to answer questions that might criminate her.

Again, in *Mayo v. Mayo*, 119 Mass. 290, the court says:

"It is within the discretion of the court and the usual practice to advise a witness that he is not bound to criminate himself, where it appears necessary to protect the rights of the witness."

The action of the trial court in not compelling Arbelle Vannoy to answer the questions asked her was strictly within the law.

Fourth. There are a number of assignments of error with reference to the refusal of the trial court to give requested instructions, and also with reference to instructions given, all of which we have examined carefully and we have read all of the instructions of the court. All of the questions presented have been previously passed upon by this court in other cases; and therefore it would be a useless consumption of time to discuss them again. The question of the sufficiency of instructions must always be determined by the facts of each case. An instruction might be erroneous as applied to a given state of facts, and the same instruction might be sufficient under a different state of facts. Looking at the instructions in this case from this standpoint, we think that they are substantially correct, and we do not see how appellant could have possibly been injured by the instructions of the court. The jury evidently came to the conclusion that the appellant was criminally intimate with the wife of the deceased, and that this was the sole cause of the homicide in this case. In this opinion we concur. Deceased was unarmed

at the time of the homicide, and his sole offense consisted in his endeavor to induce his wife to return home and discharge her duties as the mother of their children. For doing this, appellant assumed to constitute himself judge, jury, and executioner, and without giving deceased an opportunity to defend himself, he placed him on trial, sentenced him to death, and executed him on the spot, and by so doing appellant forfeited his life to society. Appellant has been tried before an able and impartial judge. He was represented by counsel of his own choice. He had every opportunity afforded him by law to make his defense. The jury appear to have been entirely fair. We think the verdict at which they arrived is the only one which could have been rendered by an intelligent and honest jury. We find no material error in the case.

We were requested by counsel for appellant to modify the judgment, in the event of an affirmance, and reduce the punishment to imprisonment for life. Section 6955, Comp. Laws 1909, gives us the power to do this, yet we think that it would be an abuse of power if we in any manner interfered with the verdict in this case. The judgment of the lower court is therefore affirmed.

The time originally provided for the execution of appellant having expired, it is ordered that the judge of the district court of Wagoner county execute a warrant in due form of law, attested by the clerk of said court and under the seal of said court, to be delivered to the sheriff of said county, commanding said sheriff to execute appellant, Dan Anderson, between sunrise and sunset on Friday, October 18, 1912, in accordance with law and the judgment of said court heretofore rendered.

ARMSTRONG and DOYLE, JJ., concur.