Ralph Gilbert ACUFF, Plaintiff in Error,

v.

The STATE of Oklahoma, Defendant in Error.

No. A–12089.

Criminal Court of Appeals of Oklahoma.

May 11, 1955.

Ralph Gilbert Acuff pro se.

Mac Q. Williamson, Atty. Gen., James P. Garrett, Asst. Atty. Gen., for defendant in error.

POWELL, Judge.

Ralph Gilbert Acuff, alias Lloyd N. Gurkin, plaintiff in error, hereinafter referred to as defendant, was charged in the district court of Oklahoma County with the crime of forgery in the second degree. Defendant refused the aid of counsel, and acted as his own attorney in the trial of the case. The jury returned a verdict of guilty and assessed the punishment to be a term of two years in the State Penitentiary. The penalty might have been seven years. Tit. 21 O.S.1951 § 1621, subd. 2.

Defendant has acted as his own counsel on appeal, and orally argued his case before this court. Ordinarily the accused does not appear before this court. The record was

prepared at the expense of Oklahoma County, and was filed in this court without cost deposit. By reason of defendant not being a lawyer, the trial court was most liberal with defendant in the matter of precedure, and this court has likewise overlooked the violation of court rules and has decided to notice issues raised on appeal by the defendant when technically, as will appear, some of the propositions are not entitled to treatment.

The pertinent portion of the information charges that:

"* * * on the 15th day of April, A. D. 1953, in Oklahoma County, State of Oklahoma, Ralph Gilbert Acuff, alias Lloyd N. Gurkin, whose more full and correct name is to your informant unknown, then and there being, did then and there wilfully, unlawfully and feloniously commit the crime of Forgery in the Second Degree in the manner and form as follows, to-wit:

"That is to say, the said defendant, in the county and state aforesaid, and on the day and year aforesaid, then and there being, did then and there wilfully, unlawfully and feloniously and with the intent to cheat and defraud, sell, utter, exchange and deliver to Local Federal Savings and Loan Association, a corporation, authorized and licensed to do business in the State of Oklahoma, for the consideration of a check drawn on Local Federal Savings and Loan Association of the value of $3,500.00 in good and lawful money of the United States of America, a forged and counterfeited check of the tenor, purport and effect following:

"'Texarkana, Arkansas, April 11, 1953
" 'The State National Bank of Texarkana
" 'Pay To Lloyd N. Gurkin    Or Bearer $4,250.00
    Four Thousand, Two Hundred and Fifty and
    no/100 Dollars.
                "'/s/  J. O. Kelly'
"/s/ on back: 'Lloyd N. Gurkin.'

with the felonious intent to have the same uttered and passed as true and genuine, and the said defendant knew that said check was forged and counterfeited, the name of J. O. Kelly being in truth and in fact a forgery, and not the true signature of J. O. Kelly, said signature being that of a fictitious person, with intent to cheat and defraud said Local Federal Savings and Loan Association out of said money as aforesaid; contrary to the form of the statutes * * *" etc.

For reversal defendant in petition in error and brief sets out seven propositions of error, as follows:

"No. One: The trial Jury was unconstitutional.

"No. Two: The Court was without jurisdiction.

"No. Three: The defendant in error failed to produce a corpus delicti.

"No. Four: The court denied the plaintiff in error the Constitutional right to present evidence to support his Defense in Theory.

"No. Five: The Court refused to order witnesses for the plaintiff in error to obey summons.

"No. Six: The Court erred in refusing to grant the plaintiff in error's motion for a new trial.

"No. Seven: The Court erred in refusing to permit the plaintiff in error to raise the question of sanity and moral responsibility."

We shall summarize sufficient of the evidence to aid in understanding the amazing issues presented.

Harold Hooper testified that he was a special agent for a group of banks and stores in Oklahoma City, handling check cases for them; that on April 15, 1953 he and Jack Ragland, detective in the Oklahoma City Police Department, assigned to forgery detail, were investigating a savings account that had been opened by Lloyd N. Gurkin at the Citizens State Bank on Twenty-third and Dewey. The account had been opened by mail with $10, later a $1 deposit was made, then a deposit of $3,750 by check on a Texarkana, Arkansas bank had been made and drawn on an apparently fictitious person with no account in such bank. The officers were on the way to the Citizens State Bank when

they received an urgent call to hurry there without delay. When the officers arrived at the Bank they learned that the defendant had been in and had presented a check for $4,250, requesting that he be given credit for $750 on his savings account, and that he be given the balance, $3,500, in cash. When this was refused the defendant left the Bank hurriedly. One of the Bank employees followed him and the officers eventually overtook defendant at Twenty-third and Walker, Oklahoma City, and took him into custody.

Defendant did not object to the statements of the officers, and in fact when he later testified, admitted that the evidence of the State's witnesses in practically all details was true, except that he denied any intent to in the end defraud anyone by reason of his admitted check manipulations.

After defendant was arrested he informed the officers that he had a car parked nearby and that he had a brief case in the car. He gave them the keys to his car. The brief case was removed and taken along with defendant to police headquarters. An examination of the brief case disclosed a check payable to Lloyd N. Gurkin from the Local Federal Savings and Loan Association for $3,500, and one to him from the Mutual Savings and Loan Association for $3,500, various pass books including one from each of the two savings and loan associations, the Citizens State Bank, the Stockyards Bank and Oklahoma National Bank.

Witness Hooper testified that defendant readily admitted that he had obtained the checks from the Local Federal Savings and Loan, and from the Mutual Savings and Loan, and that he had deposited five checks, each for $3,750 in these five institutions, and had five checks for $4,250 which he was in the process of depositing in them. He admitted that he wrote all the checks in their entirety; that there was no such person as J. O. Kelly in so far as he knew, and that he signed the name to the checks and that he endorsed each and every one of them in the name of Lloyd N. Gurkin.

Witness said that defendant further told them that he had never lived at the address 1122 Northwest Fourteenth Street, Oklahoma, that he simply used such address in opening up the accounts in the five banks and savings and loan associations; that he went to the post office immediately after giving such address and signed a card changing his address to general delivery in Oklahoma City. He then picked up the five pass books when they were received at general delivery, and mailed in deposits of $1 each.

Witness stated that defendant told him of operating the same kind of scheme in Fort Worth, Texas, in Kansas City, Missouri, and in Washington, D. C.; that he had the idea that this kind of a scheme was original with him and that he seemed proud of it. Defendant advised the officers that any offense that he had committed would be a Federal offense, and he denied that the state courts had any jurisdiction, and stated that if the case was not filed in the Federal court he would not stand on what he had told them.

Jack Ragland of the Oklahoma City police department testified substantially as Mr. Hooper.

Edna Marie Taylor, teller at the Local Federal Savings and Loan Association, testified to the details of the opening up of the account in that institution by a deposit of $10 by mail, then $1, and then of Mr. Gurkin [defendant] calling at the Association on April 10, 1953, with a check for $3,750 for deposit and being paid $7.50 in cash and $3,742.50 credited to his account, and on April 15, 1953 he brought in a check for $4,250 and that $750 was placed on his account and a check was issued to him on the Association for the balance, $3,500. The checks deposited by defendant were drawn on the State National Bank, Texarkana, Arkansas, and purportedly signed by J. O. Kelly.

The evidence developed that on identification defendant could have cashed the Local Federal Savings and Loan check at any place having sufficient funds.

Kenneth L. Lawton, auditor for the Citizens State Bank, Oklahoma City, testified concerning defendant's transactions at that Bank, which followed the same pattern

as at the savings and loan associations, except that the Bank would not issue him a check for $3,500 on a purported deposit of a check for $4,250 signed by J. O. Kelly, and endorsed by Lloyd N. Gurkin. This for the particular reason that a previous check in the sum of $3,750 and drawn on the State National Bank, Texarkana, on April 10, 1953 and deposited by the defendant had proven bogus. That is, on receipt of such check and on the evening of April 14, the State National Bank in Texarkana had telephoned the Citizens State Bank, Oklahoma City, that they had no account in the name of a J. O. Kelly. Thereafter, on April 15 when Gurkin came in and tried to get $3,500 from a new deposit of $4,250, the check drawn on the J. O. Kelly account, stating that he needed the money to purchase a farm, witness telephoned the officers, and then followed defendant until his arrest.

By stipulation the testimony of Roy J. Wright, Assistant Cashier of the State National Bank of Texarkana was read. He swore that his Bank had never had an account in the name of J. O. Kelly. ·

In his opening statement to the jury defendant admitted forging the checks in question, stating that this was all done in Dallas, Texas; he denied any intent to defraud. Said he: "I shall offer to you first, evidence to show that the defendant was, in fact, escaping from an illegal confinement in the State of California, and that all of the conduct of the defendant that he is charged with here today, had been very carefully arranged so that the United States Government, who has nation-wide subpoena power, and far greater and far better means of investigation, could take a hand in this case." Defendant then told the jury that in 1943 he had been convicted of the crime of issuing fictitious checks in the state of Wyoming and sentenced to serve from one year to eighteen months; that on February 1, 1949 he had been convicted on four charges of issuing fictitious checks and forgery in the state of California and sentenced to imprisonment of not less than five and not more than fourteen years;

that he was released from San Quentin prison on August 4, 1952, after completing three and a half years of his sentence, and paroled for a period of two and a half years.

From defendant's testimony and his briefs, it would appear that it is his contention that he was wrongfully convicted in the California case. This contention is based on the assertion that the foreman of the jury that heard his case had sought to be excused from the jury, because, as the juryman, Leo F. Fallman stated: "About three years ago I was tried in the United States District Court for a crime which, had I been found guilty, would have sent me to prison. But I defended myself and won the case, and the similarity in our cases might cause me to be prejudiced in favor of the defendant." Defendant claims that the trial judge then questioned Mr. Fallman concerning the implied prejudice, and decided that it was not enough to warrant his being excused. Defendant asserts that in November, 1949 he was able to cause a search of the FBI records to be made to verify Mr. Fallman's statement, but no record of Mr. Fallman could be found. Defendant overlooks the fact that the FBI record would not always show acquittals, when there had been no convictions, and the prospective juryman had stated that he had been acquitted. He had not given the name of the Federal District, or the State where located, so that a mere inquiry without furnishing such information could not be deemed reliable. He wanted to show that the District Attorney bribed this juryman to convict or hang the jury.

Defendant then assumes that the juryman gave false evidence and thus disqualified himself to act as a juror, and that defendant was therefore tried by eleven legal members, instead of twelve. He contends that he was, therefore, falsely imprisoned, and continues to be by reason of the parole, and that by a principle of law stated in 56 A.L.R. 666, "A person so confined is morally justified in using all force necessary to escape such imprisonment, taking care to use no more than is needed."

Defendant in opening statement said to the jury: "You have already heard the facts and there is no defense in fact. There is, however, a defense in theory that I intend to present or as much of that defense as I can."

The trial court ruled that the matters and things alleged by defendant to have happened in the case in California People v. Acuff, 94 Cal.App.2d 551, 211 P.2d 17 had no bearing on his guilt or innocence of the crime for which he was being tried in the within case. Defendant in his brief attacks the trial court for such ruling. Also a Federal Judge for not assuming jurisdiction and taking his case away from the State court, and attacks the Chief Justice of the United States Supreme Court for not, as former Governor of California, giving him relief from his alleged illegal conviction in California. In his reply brief defendant attacks the Assistant Attorney General of Oklahoma on account of the State's answer brief. Defendant thus violates the rules of this court.

Defendant argues that our Declaration of Independence provides that governments derive their just powers from the consent of the governed, and that "the conduct of the courts and officials of the state of California has resulted in a withdrawal of consent to the government of that State." He then charges evasive conduct on the part of a named Federal Judge, and he very much doubts if he will continue his consent to the government of the United States. He then challenges, "What say you, Oklahoma?" And asks if this State is to lose his consent to be governed by it.

Considering the propositions advanced in the petition in error and argued in brief; it is first contended that Oklahoma's jury law is unconstitutional for the asserted reason that its juries are constituted only of taxpayers and that non-taxpayers are systematically excluded from jury service, attemping to follow the reasoning in the Scottsboro cases from Alabama. Patterson v. State of Alabama, 294 U.S. 600, 55 S.Ct. 575, 79 L.Ed. 1082; Norris v. Alabama, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074.

Our present jury law was enacted by the 1949 Legislature and amended by the 1953 Legislature. See Tit. 38, O.S.A. §§ 18–33. Section 18 provides:

"Between the tenth and twenty-fifth day of November of each year, the County Treasurer or one of his deputies, together with the County Assessor or one of his deputies, together with the Sheriff or one of his deputies, and the County Clerk or one of his deputies, and the Court Clerk or one of his deputies, shall meet at the Courthouse of their County in the office of the County Clerk and select from the list of qualified jurors, as prescribed by this chapter, of such county as shown by the tax lists in County Assessor's office for the current year, all qualified jurors for service in the District, Superior, Common Pleas and County Courts of such County for the ensuing year in the manner hereinafter provided."

Section 33 provides (Laws 1953):

"For the purpose of ascertaining the names of all persons qualified for jury service, it hereby is made the duty of the County Assessor of each county to cause to be provided, on the forms for the listing of personal property for taxation, space for the taxpayer to list thereon the name and sex of his or her spouse if said spouse is a citizen of the United States, is over the age of twenty-one (21) years, has resided in the state one (1) year, and in the county six (6) months, and is not a listed taxpayer. Said space shall be plainly labelled: 'For Jury Purposes Only. Listing of names hereunder has no other purpose.' It shall be the duty of the County Assessor to endeavor to have the taxpayer fill in such information on the said forms; and, in each case where the County Assessor shall assess any real or personal property to any taxpayer when the taxpayer has omitted to list the same, the County Assessor shall, to the best of his ability, ascertain and list the aforesaid infor-

mation as to the spouse of the taxpayer. All names, and the addresses of the persons so named, shall be available thereafter for selection for jury service in the same manner as persons shown upon the tax lists in the assessor's office."

Section 28, covering qualifications and exemptions, provides:

"All citizens residing in this State, having the qualifications of electors, of sound mind and discretion of good moral character, not Justices of the Supreme Court, or Judges of the Criminal Court of Appeals, District Court, Superior Court, Court of Common Pleas, or County Court, sheriffs, or deputy sheriffs, constables, jailors, licensed attorneys engaged in the practice of law, habitual drunkards, not afflicted with a bodily infirmity amounting to a disability, and who have never been convicted of any infamous crime or served a term of imprisonment in any penitentiary for the commission of a felony, are competent jurors to serve on all grand and petit juries within their counties; provided, that persons over sixty (60) years of age, ministers of the Gospel, and county or district officials, practicing physicans, optometrists, veterinarians, dentists, undertakers, pharmacists, teachers in public schools, postmasters, carriers of the United States mail, members of the National Guard, persons actually engaged or employed in the publication of a newspaper, all members of good standing of any regularly organized fire department, and all women with minor children, if they claim their exemptions, shall not be compelled to serve as jurors in this State." (Amended in 1953.)

Many married citizens whose real property consists only of a homestead and household goods, one or both, for convenience list title in one spouse. And it might be possible that the homestead and most of the personal property would have been acquired and owned by one spouse prior to marriage. Nevertheless, we see that the spouse listing the property must give the name of the wife or the husband, as the case may be, in order that such spouse may not be overlooked for jury service.

Few citizens could be found otherwise eligible to vote under Tit. 38 O.S.A. § 28 who, although they might not own real estate, would surely own some personal property. See Tit. 68 O.S.A. §§ 15.1, 15.2 and 15.4. Unless one was the head of a family or an ex-service person they would not be exempt, though all they owned would be the clothes on their backs. Tit. 68 O.S.A. 15.2 subd. 12. It is difficult to conceive of a citizen who would not have some property to list.

Although we find no specific statutory provision in so many words requiring that every person shall list the clothes that he may be wearing (it can be assumed that every citizen is so equipped), if that is all the property that he owns, and providing a penalty for failure, it is required that all persons owning personal property file a list of the same with the county assessor. Tit. 68 O.S.1951 §§ 15.6, 15.7, and 15.8. And § 15.12 of the Title imposes a penalty for failure to so list on or before March 15 of each year. See also Art. V, § 50, and Art. X, § 6, Okl.Const.

Considering the citizen who by reason of a tax exemption might not actually have to pay any taxes: that question is not for the citizen to determine. The exemption is not automatic. He must list his property, specifically show that he is eligible for an exemption, and apply for the same. The valuations that he may place on his property may or may not be agreed upon and approved by the assessor and the county excise board. But if it is ruled that the taxpayer does not own enough property by reason of the exemption to pay taxes, he is still eligible to vote. See Denton v. State, 58 Okl.Cr. 275, 53 P.2d 1136, where the principle has been applied.

From a consideration of the above, it is apparent that neither the constitutional nor statutory provisions require that to be eligible to sit as a juror a citizen must be a taxpayer. It is true that the legislature in its wisdom provided that qualified jurors be

selected from the tax rolls, but if citizens otherwise qualified, do not have their names on the tax rolls it seems obvious that it would be because by their own negligence or indifference they failed to list their property, however meagre. They, therefore, have only themselves to blame if their names do not appear on the tax rolls and on the jury rolls.

The idea that the above statutory provisions violate the Fourteenth Amendment to the Constitution of the United States is rejected. See Gibson v. Mississippi, 161 U.S. 565, 580, 16 S.Ct. 904, 40 L.Ed. 1075; Owens v. Commonwealth, 1920, 188 Ky. 498, 222 S.W. 524; State v. McDowell, 1911, 61 Wash. 398, 112 P. 521, 32 L.R.A.,N.S., 414; 31 Am.Jur. § 126, p. 652; 50 C.J.S., Juries, § 124, p. 846.

The further argument that such statutory provisions violate the Sixth Amendment to the Constitution of the United States, and that the entertainment of this idea may not be avoided by saying that the first ten amendments do not apply to the states, but only to Federal courts, Spies v. Illinois, 123 U.S. 131, 8 S.Ct. 21, 22, 31 L.Ed. 80; Maxwell v. Dow, 176 U.S. 581, 20 S.Ct. 448, 451, 44 L.Ed. 597, 599; Brown v. State, 3 Okl.Cr. 475, 106 P. 975; Anderson v. State, 8 Okl.Cr. 90, 126 P. 840; Lazar v. State, Okl.Cr. 275 P. 2d 1003, cannot apply in Oklahoma in view of the provisions in the Oklahoma Constitution, Art. I, § 1, providing that "The State of Oklahoma is an inseparable part of the Federal Union, and the Constitution of the United States is the supreme law of the land."

■■ As we have seen from the cases cited immediately above, the first ten amendments were intended as restraints and limitations upon the powers of the general government, and were not intended to and did not have any effect upon the powers of the respective states. Therefore, the Federal Government is not interested in whether the respective states have or have not adopted similar provisions. Many states have in part adopted similar provisions. However, the provision of Art. I, § 1 of the Oklahoma Constitution simply means that nothing in the Constitution of the State of Oklahoma is intended to conflict with any provision of the Constitution of the United States, *where such provision is applicable to an individual state,* and if such should be the case, then any such provision would have to give way to the Federal provision. Obviously true whether so stated or not!

Defendant's second proposition of error is that "The State of Oklahoma was without jurisdiction."

This proposition is bottomed on the assertion by the defendant (1) that he made out the forged checks in Dallas, Texas, and, though he passed the same in Oklahoma City, the offense was exclusively under the jurisdiction of the Federal courts. He even asserts that he planned it that way, and complains because his case was never transferred to a Federal court. (2) Defendant contends Oklahoma's courts lacked power to compel his witnesses to come to Oklahoma from out of the State to testify in his behalf, and therefore the State courts lacked jurisdiction "over the defense to the case", and for such reason it came exclusively under the jurisdiction of the Federal courts.

The crime charged against defendant was based on the violation of Tit. 21 O.S. 1951 § 1577, which provides:

"Every person who sells, exchanges or delivers for any consideration any forged or counterfeited promissory note, check, bill, draft, or other evidence of debt, or engagement for the payment of money absolutely, or upon any contingency, knowing the same to be forged or counterfeited, with intent to have the same uttered or passed, or who offers any such note or other instrument for sale, exchange or delivery for any consideration, with the like knowledge and intent, or who receives any such note or other instrument upon a sale, exchange or delivery for any consideration with the like knowledge and intent, is guilty of forgery in the second degree."

■■ From the language of the statute we conclude that the actual making or forging of a check is not an essential element of the offense. But the offense is the

passing of the check, knowing it to be forged, and with the intent that it be uttered or passed. The fact that defendant may have prepared the check in Dallas and made his plan for cashing it in Dallas and in pursuance to the plan brought the check to Oklahoma City, would not constitute an offense under the above statute. He might have given up the idea of passing the check. But when he actually passed it, then the statutory provision was violated.

That defendant personally appeared at the Local Federal Savings and Loan Association in Oklahoma City, and presented a forged check in the amount of $4,250, which was exchanged for the check of Local Federal in the amount of $3,500, with the balance of $750 being deposited to defendant's account at Local Federal, is not disputed. Defendant admitted that in furtherance of his scheme that he had prior to this time, and after the initial deposit of $10, deposited $1 in actual money, plus another forged check in the amount of $3,750.

We conclude that every essential element of the offense was committed in Oklahoma County, Oklahoma, and no essential element occurred outside the State of Oklahoma.

█ Prior to the filing of a demurrer to the information and entry of his plea, defendant filed a motion to dismiss the charge on the ground that all the witnesses needed by him for his defense lived outside the State of Oklahoma, and were therefore not subject to the authority of the State, and that should the court retain the case, such would in effect be denying defendant the constitutional right of defense. The names of the witnesses or the facts material to defendant's defense to which they would testify were not disclosed. By reason of such omission alone the court was justified in overruling the motion. See Tit. 22 O.S.1951 § 715.

Not only did the motion fail to set out the names of the witnesses and what they could be expected to testify material to the case, but also failed to allege that defendant would be prepared to have any of them personally present at a later date, or that he would be able to obtain their depositions.

[8] The action of the court in overruling the motion to dismiss on account of out-of-state witnesses not being available, the omission from the motion of the information that we mention brings this court nothing to review. This principle, though applied in cases seeking a continuance for the purpose of obtaining the testimony of out-of-county witnesses present within the State, is applied in the case of Lyons v. State, 6 Okl.Cr. 581, 120 P. 665, and Kidd v. State, 76 Okl.Cr. 213, 136 P.2d 210.

█ To a motion filed in this court on January 5, 1955, entitled: "Motion to hear appeal by petition in error and oral argument" is attached a copy of what purports to be a motion for a continuance filed in the trial court (Case No. 21804). The filing date is not shown, and the motion does not appear in the casemade presented to this court, and for such reason is not deserving of consideration. A continuance of the trial for two weeks is asked for the purpose of "ordering the following named witnesses to appear at public expense." Some thirty-six out-of-state witnesses are listed, including the Chief Justice of the United States Supreme Court, and various officials from California, as well as witnesses from Texas, along with statements of what each witness would testify, and involving a purported "defense in theory", defendant admitting that he had "no defense in fact." Suffice to say it was not claimed that any out-of-state witness knew anything about the act charged in the information, but on the contrary they, for the most part, would testify concerning an alleged illegal previous conviction in the State of California. The disposition hereinafter of defendant's fourth proposition will have the effect of disposing of the within proposition, as well as the sixth, on the merits. The seventh proposition will be treated separately.

Defendant's third proposition is that "The State failed to produce a corpus delicti."

This proposition is based on the fact that defendant admittedly masquerading under his alias name of Lloyd N. Gurkin, had deposited with the Local Federal Savings and Loan Association a forged check in the amount of $4,250, had received credit for

$750 and the Association had issued a check to him for $3,500, at his request, and which check of course was subject to being cashed by the defendant at any time. And he had apparently planned to do that very thing, if he had not been apprehended prior to having the opportunity.

The defendant introduced into evidence a letter addressed to the Attorney General of the United States, dated April 15, 1953. In this letter he catalogued his record for forgery, etc., which he claimed was for the sole purpose of obtaining money to reopen a case in California, clear himself of an illegal conviction, and escape "illegal imprisonment". This, he claimed, justified and excused his acts, and disproved his intent to defraud. In his letter he advised the Attorney General that he was enclosing $2,000 to apply on repayment to the victims of his forgeries. When arrested, this letter together with the check from the Local Federal Savings and Loan Association for $3,500, and the one from the Mutual Savings and Loan Association for $3,500, both just issued but not yet cashed, were found in his brief case.

■ By reason of the non-cashing of the Local check it is argued by defendant that he has received nothing of value. Not so. The defendant received in exchange for his forged check a credit to his account of $750 and a valid check in the amount of $3,500. The fact that he had not at time of apprehension had time to, or had not, turned the checks into cash is not a defense. Tit. 21 O.S.1951 § 1577; heretofore quoted, provides, as we have seen (if other elements are present) that the offense is complete upon the passing or exchange of a forged check "for any consideration". This court has so held in the case of Guess v. State, 53 Okl.Cr. 301, 11 P.2d 199.

In addition to the noncompliance with rules of procedure treated under defendant's proposition two, if the matters complained of had been correctly raised, it still would have been necessary for the answers to defendant's proposition four to have been in his favor in order for him to have prevailed. He asserts: "Plaintiff in error was denied the right to present a defense in theory." What did he mean? Defendant said in his opening statement that he had no "defense in fact". He testified and on cross-examination admitted every act charged by the State. We quote from his testimony:

"Q. So actually about the only place where we are at variance in this case is your contention that the State of Oklahoma lacks jurisdiction to try you, and that for that reason you have stated, and attempt to state your lack of criminal intent, that you had justification in each of these acts because they would further your attempt to escape from some illegal imprisonment, and that you really needed the money? Those are about the only places where we are at a variance? It that true? A. That is the only place we are at variance, yes."

From a reading of the casemade and the various instruments filed in this court by the defendant, it appears, as already suggested, that his "defense in theory", is based upon an effort to prove that he was unlawfully convicted in the courts of the State of California on perjured evidence connived in by the district attorney of Martinez, California, and the foreman of the jury; that the foreman of the jury was not qualified to act as a juror, and defendant was therefore unlawfully convicted in the courts of the State of California, and that the acts of forgery committed in Oklahoma were a part of his effort to escape from "unlawful imprisonment" resulting from such conviction and a later parole granted to him by the State of California. His theory was that if he was illegally convicted in the State of California and imprisoned as a result thereof that, in his own words: "An escape from it is an excusable crime and any acts which took place in the course of that escape is also excusable." He cites in support a note in 56 A.L.R. 666, where it is stated: "When the imprisonment is illegal the prisoner is not guilty of escape in leaving custody," and calls particular attention to People v. Clark, 1924, 69 Cal.App. 520, 231 P. 590, and Miers v. State, 1895, 34 Tex.Cr.R. 161, 29 S.W. 1074, 53 Am.St.Rep. 705, as supporting his theory.

In the Clark case the defendant had plead guilty to the crime of burglary, sentence was pronounced but suspended, and Clark was remanded to the custody of the sheriff to work at the county road camp, where he was taken on the day of sentence, but from which camp he peaceably departed on the same day. The court held as a matter of law that the trial court upon suspension of a sentence of imprisonment was without authority to further restrain or confine the defendant, so that the officer had no authority to imprison the defendant. It was also said [69 Cal.App. 520, 231 P. 591] that, "there can be no escape, in the sense of the law, unless there was a lawful custody". Clark's conviction of escape was reversed.

In the Miers case, the defendant was arrested by a constable without aid of warrant. The prisoner asked the constable to show him a warrant or authority for the arrest and the prisoner was told by the constable that he had no warrant, and did not need one. Thereafter the prisoner asked to be permitted to enter his home and get his breakfast. After some discussion the constable agreed to this. Upon the gallery of the house was lying a Winchester rifle, and the prisoner passed by it, but the constable picked it up, put a shell in it, and the prisoner then ran through the house and left with a gun in his hand. The constable had the rifle aimed at the prisoner, and both fired at the same time. The officer was killed and the prisoner wounded. It was held as a matter of law that Clark was illegally arrested. The court held: "A person illegally arrested, though he has acquiesced in the arrest, may use such force as is necessary to regain his liberty; and, if it reasonably appears that the officer intends to shoot to prevent his escape, may shoot the officer in self-defense."

In the within case the defendant under his statement was convicted in the State of California on two charges of issuing fictitious checks and two charges of forgery, and was released from the San Quentin prison after completing three and a half years of a six-year sentence, and was paroled for a period of two and a half years. He escaped from the parole, and thereafter by his own admission put in operation a bogus check scheme in a number of states, including Oklahoma, for the purpose, he says, of raising money for fighting the California conviction and thus escaping from an illegal imprisonment. He had previously failed to obtain a pardon in California, but obtained a parole. He thus justifies his admitted forgery in the within case and claims that the trial court erred in not submitting to the jury the question of whether he was illegally convicted in the State of California, and if it was so determined, that then as a matter of law he had a right to escape from such illegal imprisonment, and had a right to forge the check involved in the within charge, if he would show that he intended to use the funds to fight his case in California and eventually to repay his victims.

Obviously neither the Clark case nor the Miers case above referred to supports such a proposition. And we fail to find any case in 56 A.L.R. 666 or any statement there that would support such a proposition. So far as we know, the defendant was legally convicted in California. He was convicted. The assumption therefore is that the conviction was legal. It is preposterous to think that this court would have any jurisdiction to inquire into such conviction or that even though the California conviction was in fact illegal that such fact could justify the defendant in committing a crime in the State of Oklahoma for the purpose of obtaining funds with which to fight his so-called illegal imprisonment in California. The trial court correctly rejected such defense.

Under his fifth proposition defendant says: "In addition to being denied witnesses from outside the State of Oklahoma to support the *justification portion* of the defense in theory, as described in Point No. 4 of his brief, plaintiff in error was denied witnesses which would have supported the secondary point of defense,—the lack of intent to defraud."

Defendant wanted to subpoena one Corliss Amil Kaup from the Oklahoma

State Penitentiary at McAlester to support his position that, under the circumstances heretofore recited there was no intention to defraud. He would show by Kaup that he, defendant, had promised Kaup assistance in the courts and had made every effort to fulfill such promise, thus proving that defendant was a man of his word. This in turn would tend to support defendant's promise in a letter to the Attorney General of the United States to repay the sums that he obtained from his forgeries, the source being from $5,000 damages he expected to obtain from the State of California on account of imprisonment based on a false conviction, and from funds from a business he intended to establish.

The trial court properly held that intent to repay would not constitute a defense. See Ex parte Warford, 3 Okl.Cr. 381, 106 P. 559; O'Neil v. State, 76 Okl.Cr. 107, 119, 134 P.2d 1033.

Defendant's sixth proposition that the court erred in overruling his motion for new trial is of course involved in each proposition presented, and does not constitute a separate proposition of error.

The final proposition presented is that the trial court erred in denying defendant the right to raise the issue of his own sanity.

The record discloses that no issue was raised as to defendant's sanity either prior to or during trial. Trial was had on November 10, 1953, judgment and sentence day was fixed for November 17, 1953. At that time the defendant for the first time stated that he would like to raise the question of his sanity prior to presenting his motion for new trial. He wanted the court to pass his case to the heel of the docket so that he could present his motion for new trial a little better. The court accordingly passed the matter until 1:30 P.M. of that day, at which time defendant stated that he wanted to raise the question of his sanity under authority of Tit. 22 O.S.1951 § 1162. He wanted a jury convened to determine the question of his sanity at the time of the commission of the crime. It is not clear that he claimed to be then insane. No written motion raising this ques-

tion was filed, no affidavits concerning the question were filed, and no evidence offered. The motion for new trial contained no allegation of insanity, past or present. The court overruled defendant's verbal motion and passed judgment.

The statutory provision, Tit. 22 O.S.1951 § 1162, reads:

"When an indictment or information is called for trial, or upon conviction the defendant is brought up for judgment, if a doubt arise as to the sanity of the defendant, the court must order a jury to be impaneled from the jurors summoned and returned for the term, or who may be summoned by direction of the court, to inquire into the fact."

It is the duty of the court to impanel a jury to try the fact of insanity if a "doubt" has arisen as to defendant's sanity. This may be done either prior to trial, or after trial and prior to judgment. It has been pointed out by this court, however, that where no doubt exists in the mind of the court as to defendant's present sanity, that a jury should not be impaneled to determine such question; that the doubt justifying the impaneling of a separate jury to try the issue of the defendant's present sanity, under the statute, must arise in the mind of the court from the facts and circumstances, which facts and circumstances should be of a substantial character. Maas v. Territory, 10 Okl. 714, 63 P. 960, 53 L. R.A. 814; Grayson v. State, 85 Okl.Cr. 266, 188 P.2d 696. See also the late case of Berwick v. State, 94 Okl.Cr. 5, 229 P.2d 604, where the whole question is reviewed.

In the absence of evidence tendered or heard to support defendant's suggestion of insanity, this court is not in position to say that the trial court erred in overruling defendant's verbal motion for the empaneling of a jury to determine the question of his sanity. The trial court had opportunity to observe the defendant and apparently did not entertain any doubt as to his sanity.

The judgment and sentence appealed from is affirmed.

JONES, P. J., and BRETT, J., concur.