561 F.2d 175
 Juanita MOORER, Marilyn Gilbert, Roy Isom and Barbara Isom,
Capitola Cunningham, Jan Willsey, Norma Thomas, Hazel
Haughenberry and Lamont Chandler, Individually and on behalf
of all others similarly situated, Appellees,
v.
The DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, Carla A.
Hills, Secretary of the Department of Housing and Urban
Development, William R. Southerland, Area Director,
Department of Housing and Urban Development, American
Development Corporation, Kenwood Apartments, a California
Limited Partnership, James E. Thompson, Operations Officer,
American Development Corporation, and Westport Co-operative
Mission, Inc., Appellants.
 No. 76-1830.
 United States Court of Appeals,
Eighth Circuit.
 Submitted May 17, 1977.
Decided Sept. 9, 1977.
 
 1
 Bruce G. Forrest, U. S. Dept. of Justice, Appellate Sec., Civ. Div., Washington, D. C., for appellants; Bert C. Hurn, U. S. Atty., Kansas City, Mo., Ronald R. Glancz, Atty., Civ. Div., Dept. of Justice, Washington, D. C.; Rex E. Lee, Asst. Atty. Gen., on briefs; and Barbara Allen Babcock, Asst. Atty. Gen., Washington, D. C., on appellants' reply brief.
 
 
 2
 J. D. Riffel, Legal Aid and Defender Society, Kansas City, Mo., for appellees; James Gramling, Kansas City, Mo., on the brief.
 
 
 3
 John Sherman Cooper, Theodore Voorhees, Jr., Sana F. Shtasel and Douglas E. Winter of Covington & Burling, Washington, D. C., and Florence W. Roisman, National Housing Law Project, Washington, D. C., amicus curiae on brief.
 
 
 4
 Before STEPHENSON and WEBSTER, Circuit Judges, and BENSON, District Judge.*
 
 
 5
 BENSON, District Judge.
 
 
 6
 In this case, the Department of Housing and Urban Development, Carla A. Hills, the Secretary, and William R. Southerland, Area Director, have appealed from a decision of the district court and have stated the issue to be
 
 
 7
 whether the Uniform Relocation and Assistance and Real Property Acquisition Policies Act ("URA") 42 U.S.C. 4601, et seq., provides benefits for persons displaced by a private company which acquired property for rehabilitation with the aid of federal mortgage insurance and interest subsidies.
 
 
 8
 The district court ordered the case certified as a class action, dismissed it as against the non-federal defendants and held that plaintiffs-appellees were entitled to URA financial benefits. We reverse the holding that the class is entitled to URA financial benefits.
 
 
 9
 On a stipulation of facts, the plaintiffs-appellees moved the district court for summary judgment on the issue of liability, and the federal defendants, appellants herein, filed their cross-motion for summary judgment of dismissal. The following, in abbreviated form, are the facts as summarized by the trial court.[1]
 
 
 10
 Project Rehab was initiated by the Department of Housing and Urban Development (HUD) in 1969 as an internally developed program utilizing existing mortgage insurance programs in order to encourage large scale rehabilitation of existing structures to provide adequate housing for low and moderate income residents of central cities. Project Rehab was to be funded through existing mortgage insurance and federal subsidy programs available for residential rehabilitation.
 
 
 11
 One of the existing mortgage insurance programs utilized by HUD in connection with Project Rehab was Section 236 of the National Housing Act, 12 U.S.C. § 1715z-1, which consists of mortgage insurance and periodic interest reduction payments to private mortgagors to reduce the private sponsor's mortgage interest cost to as low as one percent. The savings were to be passed on to tenants in the form of lower rents.
 
 
 12
 A city, to participate in Project Rehab, had to be officially designated by HUD as a Project Rehab city. Once a city was so designated, HUD would commit the necessary housing subsidy funds.
 
 
 13
 The city of Kansas City, Missouri, submitted a proposal to HUD requesting that Kansas City be designated a Project Rehab city. The proposal was based on private sponsorship of large scale inner-city housing rehabilitation. The city also agreed to provide assistance to persons displaced by the project and to coordinate such activities through its central relocation agency.
 
 
 14
 HUD approved the proposal and invited the city to participate as a Project Rehab city, conditioned on the city's agreement to establish a Project Rehab Steering Committee (PRSC) to coordinate Project Rehab activities in the city. A PRSC was appointed and was given the responsibility of screening applications of private sponsors submitted to HUD. An application would not receive Project Rehab funds unless first approved by the PRSC. The PRSC received no funds from HUD or any other federal agency.
 
 
 15
 Defendant American Development Corporation (ADC), a private agent for six California limited partnerships, received approval as a sponsor by the PRSC and HUD to rehabilitate and market six housing projects in Kansas City under Project Rehab, each to be operated by one of the limited partnerships. All six projects were to receive interest subsidy payments and FHA insured mortgage financing authorized by Section 236.[2] In addition, each limited partnership entered into an agreement with HUD for rental assistance to be provided for a certain percentage of the units involved.
 
 
 16
 After approval of its application and sponsorship, ADC negotiated the purchase of the property for the six projects and notified the residents that their tenancies would be terminated. All the buildings were located outside areas designated by HUD as Model Cities, Urban Renewal or Neighborhood Development areas of Kansas City.[3] The relocation of all individuals displaced was accomplished by means of a private relocation agency and not according to the procedures set forth in the URA.
 
 
 17
 URA benefits were not provided because HUD interpreted the URA to exclude from its terms moves resulting from private acquisition of property unless the displacee resided in areas designated for Model Cities, Urban Renewal or Neighborhood Development Programs. Pursuant to the agreement ADC had with HUD, it tendered to a private, non-profit relocation agency a maximum payment of $300 for actual moving expenses incurred by the displaced person. The relocation agency ultimately paid a maximum of $200 to qualified occupants and retained the remaining $100 per unit for administrative costs. None of the persons displaced received benefits, assistance or services provided by the URA.
 
 
 18
 The parties also stipulated that congressional appropriations have neither been sought nor received for Project Rehab activities, and no legislation has been enacted. The rehabilitation on all the projects was accomplished with private mortgage money on F.H.A. guaranteed loans from private institutions.
 
 I.
 
 19
 The real property from which the class was dispossessed had been acquired by a private party who received federal financial assistance under Section 236 of the National Housing Act, in the form of interest and rental subsidy payments and F.H.A. mortgage insurance. Plaintiffs-appellees claim they were entitled to URA benefits, arguing that they were forced to move as a result of an acquisition of property by Project Rehab, which they contend is a program or project of a federal agency. They further contend that the fact that the property was acquired by a private party who thereafter terminated their tenancies is irrelevant in determining eligibility under URA.
 
 
 20
 HUD resists plaintiffs' claim and contends that URA benefits are limited by statute to persons displaced as a result of an acquisition of real property by a federal agency, or by a state agency receiving federal financial assistance. It argues that in this case ADC, in participating in Project Rehab, is neither a federal agency nor a state agency receiving federal assistance.
 
 
 21
 The issue presented involves a matter of statutory construction. 42 U.S.C. § 4622(a) provides:
 
 
 22
 (a) Whenever the acquisition of real property for a program or project undertaken by a Federal agency in any State will result in the displacement of any person on or after January 2, 1971, the head of such agency shall make a payment to any displaced person, upon proper application as approved by such agency head, for
 
 
 23
 (1) actual reasonable expenses in moving himself, his family, business, farm operation, or other personal property;
 
 
 24
 (2) actual direct losses of tangible personal property as a result of moving or discontinuing a business or farm operation, but not to exceed an amount equal to the reasonable expenses that would have been required to relocate such property, as determined by the head of the agency; and
 
 
 25
 (3) actual reasonable expenses in searching for a replacement business or farm.
 
 
 26
 The benefits therefore accrue to any "displaced person." "Displaced person" is defined for the purposes of the URA in 42 U.S.C. § 4601(6) as follows:
 
 
 27
 (6) The term "displaced person" means any person who, on or after January 2, 1971, moves from real property, or moves his personal property from real property, as a result of the acquisition of such real property, in whole or in part, or as the result of the written order of the acquiring agency to vacate real property, for a program or project undertaken by a Federal agency, or with Federal financial assistance; and solely for the purposes of sections 4622(a) and (b) and 4625 of this title, as a result of the acquisition of or as the result of the written order of the acquiring agency to vacate other real property, on which such person conducts a business or farm operation, for such program or project.
 
 
 28
 The question for resolution, therefore, is whether persons displaced by private acquisitions of real property, which acquisitions are aided by federal financial assistance through mortgage insurance and interest rent subsidy payments, are "displaced persons" as that term is defined in 42 U.S.C. § 4601(6).
 
 II.
 
 29
 The URA, Public Law 91-646, 84 Stat. 1894, enacted January 2, 1971, has a policy declaration in 42 U.S.C. § 4621:
 
 
 30
 The purpose of this subchapter is to establish a uniform policy for the fair and equitable treatment of persons displaced as a result of Federal and federally assisted programs in order that such persons shall not suffer disproportionate injuries as a result of programs designed for the benefit of the public as a whole.
 
 
 31
 Despite this broad statement of policy, the operational sections through which this policy is implemented are more narrowly drawn. The statute mandates that benefits shall be extended to persons displaced by real property acquisition when the real property is acquired "for a program or project undertaken by a Federal agency" (§ 4622(a)) or "(w)henever real property is acquired by a State agency . . . ." (§§ 4627, 4628). Under § 4630 benefits inure when a person is displaced by action of a State agency operating with a grant "under which Federal financial assistance will be available . . . ." We are therefore drawn to the conclusion that the plain statutory language indicates that the URA benefits are available to displaced persons only on projects undertaken by federal agencies or by state agencies receiving federal financial assistance.[4]
 
 
 32
 This conclusion is supported by other sections of the statute. Section 4633(a) provides that the heads of federal agencies concerned with federal projects "or programs or projects by State agencies receiving Federal financial assistance . . . shall consult together on the establishment of regulations and procedures for the implementation of (programs for relocation assistance)." Section 4633(b) provides
 
 
 33
 that any person aggrieved by a determination as to eligibility for a payment authorized by this chapter, or the amount of a payment, may have his application reviewed by the head of the Federal agency having authority over the applicable program or project, or in the case of a program or project receiving Federal financial assistance, by the head of the State agency.[5]
 
 In addition, § 4625(b) provides:
 
 34
 (b) Federal agencies administering programs which may be of assistance to displaced persons covered by this chapter shall cooperate to the maximum extent feasible with the Federal or State agency causing the displacement to assure that such displaced persons receive the maximum assistance available to them.
 
 
 35
 The district court held that under § 4601(6), persons displaced by ADC come within the definition of "displaced person," since plaintiffs were displaced "as a result of the acquisition of . . . real property . . . for a program or project undertaken by a Federal agency, or with Federal financial assistance." In the words of the district court:
 
 
 36
 This definition clearly covers persons in the position of plaintiffs who were forced to move from their residences as a result of the acquisition of real property by defendant American Development for rehabilitation under HUD's Project Rehab. Project Rehab was a "program or project undertaken by a Federal agency." It could also be considered as a program or project undertaken with Federal financial assistance.
 
 
 37
 Moorer v. Department of Housing & Urban Dev., 417 F.Supp. at 1269 (footnotes omitted).
 
 
 38
 Project Rehab, even if considered to be a "program or project undertaken by a Federal agency", neither acquired the real property nor entered a written order displacing the tenants. Project Rehab received no separate funding, but rather utilized existing federal mortgage insurance and subsidy programs. Id. at 1264. It should also be noted that mortgage insurance is expressly excluded in the definition of "Federal financial assistance" in § 4601(4), which provides:
 
 
 39
 (4) The term "Federal financial assistance" means a grant, loan, or contribution provided by the United States, except any Federal guarantee or insurance . . . .
 
 III.
 
 40
 We are aware that "(r)eliance on legislative history in divining the intent of Congress is . . . a step to be taken cautiously." Piper v. Chris-Craft Industries, Inc., 430 U.S. 1, 26, 97 S.Ct. 926, 941, 51 L.Ed.2d 124 (1977), but in this case it is appropriate to examine the legislative history because it has been argued by the parties, and because the district court extensively drew on legislative history in reaching its conclusion.
 
 
 41
 The district court rejected the argument advanced by HUD that the legislative history evinced an intent by Congress to withhold benefits under URA to persons displaced by private entities that received federal financial assistance. In support of its conclusion, the district court quoted the House Report at 5853:
 
 
 42
 It is immaterial whether the real property is acquired before or after the effective date of the bill, or by Federal or State agency; or whether Federal funds contribute to the cost of the real property. The controlling point is that the real property must be acquired for a Federal or Federal financially assisted program or project.[6]
 
 
 43
 The House Report at 5850 states that the URA was designed "to provide for uniform and equitable treatment of persons displaced . . . by Federal and federally assisted programs . . . ." Section 204 of the URA, 42 U.S.C. § 4624, "provides payments for tenants and for home owners, not eligible for assistance under Section 203 who are displaced from dwellings for Federal projects (Section 210 makes the same payments available to Federal financially assisted programs and projects)." House Report at 5861. Section 210 applies only to state agencies receiving federal financial assistance. No mention is made of private sponsors receiving federal financial assistance. Section 213, pertaining to regulations and procedures, was drafted "to promote uniform and effective administration of relocation assistance and land acquisition of State or local housing agencies, or other agencies having programs or projects by Federal agencies or programs or projects by State agencies receiving Federal financial assistance . . . ." 42 U.S.C. § 4633.
 
 
 44
 In the hearings of the Senate Subcommittee considering S.1, which eventually became the Uniform Relocation Act, the emphasis was on acquisitions through the power of condemnation by federal agencies and state and local public agencies receiving federal financial assistance.
 
 
 45
 At the opening of the Senate hearings on S.1, Senator Muskie, Chairman of the Subcommittee in which the bill was considered, made a statement that included the following:
 
 
 46
 Today we begin hearings on legislation to establish a uniform policy with respect to relocation assistance and land acquisition involving Federal and federally assisted programs.
 
 
 47
 In my opinion, this is as high priority a measure as stands before the Senate today. There are more than 50 Federal programs which result in the condemning of land and literally, the bulldozing of hundreds of thousands of people from their homes and businesses each year.
 
 
 48
 Our primary objective in sponsoring S.1 is to establish a uniform policy among Federal agencies, and State and local recipients of Federal funds in their dealings with property owners and others displaced by Federal or federally aided land acquisitions.
 
 
 49
 Hearings before the Senate Subcommittee on Intergovernmental Relations of the Senate Committee of Governmental Operations, 91st Cong., Vol. 1, at 1-2 (1969). Senator Moss, in support of the bill, stated:
 
 
 50
 It requires that State and local governments administering Federal grants must assure the availability of standard housing before proceeding with property acquisition that displaces people.
 
 
 51
 Id. at 162.
 
 
 52
 Richard C. Van Dusen, Under-Secretary of the Department of Housing and Urban Development, stated of S.1:
 
 
 53
 While the Constitution clearly provides that private property may not be taken for public purposes without just compensation, we have applied in many situations an unrealistic concept of "just compensation." We have tended to equate the taking of property by Government, through eminent domain or the threat of eminent domain, with a voluntary sale. We have assumed that if the owner of the property, or some legal interest in it, is paid the market value of what is taken from him, the Government's obligation to him then comes to an end.
 
 
 54
 Id. at 198.
 
 
 55
 Hearings on S.1 were held before the House Committee on Public Works. There too the emphasis was on the acquisition of real property by federal or federally assisted programs through eminent domain procedures.
 
 Congressman Howard stated:
 
 56
 Today we open hearings on a number of bills which have as their purpose the establishment of uniform policy for compensation and assistance for persons affected by real property acquisition in Federal and federally assisted programs.
 
 
 57
 Hearings before the Committee on Public Works of the House of Representatives, 91st Cong., Vol. 3 at 1 (1969). Congressman Thompson stated the bills were directed to "the problem of urban renewal, airport development, highway construction, (and) Federal office buildings. . . ." Id. at 95.
 
 
 58
 Several witnesses pointed out that S.1, as it passed the Senate and was subsequently approved by the House of Representatives, failed to provide coverage for persons in plaintiffs' situation, who were displaced by land acquisition by private persons using federal funds. Congresswoman Edith Green stated:
 
 
 59
 I would like to call to the attention of the committee one other fact that relocation payments, by reason of displacement under the Higher Education Facilities Act, will not be solved if this comprehensive bill relates only to Federal programs of and or acquisition of land by a state unit under the Federal program.
 
 
 60
 Id. at 59. Similarly, Congressman Ryan noted:
 
 
 61
 The effect upon the affected individual is the same whether he is displaced as a result of the action of a Federal agency, a State agency using Federal assistance, a local public agency, or a private institution using a Federal grant or loan program.
 
 
 62
 The need for a uniform policy for Federal agencies and State agencies using Federal assistance is recognized in S.1 which the Senate passed. But the problem of displacement by private institutions through federally assisted programs requires a legislative solution.
 
 
 63
 The Senate has passed S.1, but it does not touch the problems of displacement caused by federally assisted expansion of private institutions.
 
 
 64
 Id. at 98, 100.
 
 
 65
 A few days after the URA became effective, Congressman Ryan expressed the view that relocations required by private actions using federal funds were not within the terms of the statute. 116 Cong.Rec. 41,254-55 (Dec. 11, 1970) (remarks of Rep. Ryan).
 
 
 66
 Subsequent to the enactment of the URA, numerous attempts have been made to amend it to include federally assisted programs or projects undertaken by private persons. In 1972[7] and 1973[8], efforts to enact such an amendment were unsuccessful. Senator Muskie, sponsor of the Uniform Relocation Act as it was enacted, reported from the Senate Committee on Government Operations, S. 261, S.Rep.No.93-10, 93rd Congress, 1st Session, (January 31, 1973) (hereinafter "Senate Report 93-10"), a proposed amendment to the URA extending benefits to projects receiving Section 236 of Rent Supplement Assistance. Senator Muskie stated:
 
 
 67
 The Uniform Relocation Assistance and Real Property Acquisition Act of 1970 now provides benefits to persons displaced by the acquisition of real property by a Federal agency or a State or State agency acquiring the real property as a required contribution incidental to a Federal program or project. S. 261 amends the Act to extend benefits to persons displaced by eight specified Federal programs which may be undertaken by persons other than a Federal agency or a State or State agency.
 
 
 68
 It was the intent of Congress to establish a uniform policy for the fair and equitable treatment of persons displaced as a result of all Federal and federally assisted programs and projects. However, the manner in which the Uniform Relocation Act is written excludes persons displaced by Federal projects undertaken by any entity other than an agency of the Federal Government, a State or State agency.
 
 Senate Report 93-10, supra at 7.[9]
 IV.
 
 69
 The application of the URA to relocations arising out of programs operated by private persons receiving federal loans or other assistance was litigated in Parlane Sportswear Company, Inc. v. Weinberger, 513 F.2d 835 (1st Cir. 1975), cert. denied, 423 U.S. 925, 96 S.Ct. 269, 46 L.Ed.2d 252 (1975). In that case Tufts University, a private institution, received substantial grants for a Cancer Research Center from the National Institute of Health, a division of the Department of Health, Education and Welfare. A manufacturer displaced by the project sought relocation assistance under the URA. The district court dismissed the complaint. The court of appeals cited HEW's regulations construing § 4622(a), which refer to "direct projects of the Department," 45 C.F.R. § 15.5(a), and deny aid to persons displaced by federally assisted projects of private entities, 45 C.F.R. § 15.6, and held that such a "contemporaneous construction of the statute (was correct)." 513 F.2d at 837.
 
 
 70
 The URA was intended to benefit those displaced by public agencies with coercive acquisition power, such as eminent domain. It was intended to benefit individuals who were not willing sellers.[10] Project Rehab played a significant role in procuring Section 236 benefits for ADC. However, as mentioned elsewhere in this opinion, ADC acquired the property by negotiation with the sellers. ADC is a private entity without power of eminent domain. Therefore, we conclude the appropriate inquiry in determining whether URA benefits attach in this case is: Was the real property acquired by a governmental entity with the power of eminent domain. The focus is not on the degree of involvement by a federal or state agency, or a program of such agency, which results in the acquisition, but is instead on whether the person involved was displaced by governmental action either acquiring the property or issuing an order to vacate the property. Neither situation is present in this case.
 
 
 71
 The holding of the Court is that the plaintiffs in this case are not "displaced persons" entitled to benefits under the Uniform Relocation Act. If relief is to be provided to plaintiffs and others similarly situated, it must come from the Congress and not the courts.
 
 
 72
 Judgment on the district court's memorandum and order was entered on the same day that the memorandum and order was filed. The appeal taken in this case is designated as being from the "Memorandum and Order." Both the memorandum and order and the judgment ordered:
 
 
 73
 (1) that plaintiffs' motion for certification of a class should be and the same is hereby granted;
 
 
 74
 (2) that plaintiffs' motion for summary judgment on the question of liability against the federal defendants should be and the same is hereby granted;
 
 
 75
 (3) that the motion for summary judgment filed by the federal defendants should be and the same is hereby denied;
 
 
 76
 (4) that the motion of defendant American Development Corporation to dismiss should be and the same is hereby granted.
 
 
 77
 On this appeal, which the Court will construe to be an appeal from both the Memorandum and Order and the Judgment, parts (1) and (4) were not made an issue or argued. Those parts of the judgment are affirmed. Parts (2) and (3) are reversed, and plaintiffs' complaint against the federal defendants is dismissed.
 
 
 
 *
 The Honorable Paul Benson, Chief Judge, United States District Court for the District of North Dakota, sitting by designation
 
 
 [1]
 Moorer v. Department of Housing and Urban Development, 417 F.Supp. 1261 (W.D.Mo.1976)
 
 
 [2]
 Apparently the insured mortgage financing authorized by Section 236 was implemented through the F.H.A
 
 
 [3]
 The parties are in agreement that displacements within the geographic boundaries of a Model Cities, Urban Renewal, or Neighborhood Development Program would be covered by URA. 42 U.S.C. § 4637
 
 
 [4]
 But see footnote 3
 
 
 [5]
 House Report No. 91-1656, 91st. Cong., 2d Sess. (1970), U.S.Code Cong. & Admin.News, pp. 5850, 5855 (hereinafter "House Report") in comment on § 4633(b)(3) states:
 Section 213(b)(3) of the bill provides an alternate to judicial review, by requiring the heads of Federal agencies to establish regulations and procedures that will assure (that) any person aggrieved by a determination as to eligibility for a payment authorized by this act, or the amount of the payment, may have his application reviewed by the head of the Federal agency having authority over the project; or in the case of a program receiving Federal financial assistance, by the head of the State agency.
 Id. at 5855.
 
 
 [6]
 The House Report cites as examples persons forced to move as a result of state highway departments' acquisition of rights-of-way and acquisition of real property by the Post Office Department, neither of which is analogous to the facts presented in this case. Indeed, the Report continues:
 It makes no difference to a person required to move because of the development of a postal facility which method the postal authorities use to obtain the facility, or who acquires the site or holds the fee title to the property. Since the end product is the same, a facility which serves the public and is regarded by the public as a public building, any person so required to move is a displaced person entitled to the benefits of this legislation.
 House Report at 5854.
 In this case, privately developed housing units are not facilities that serve the public nor are they regarded by the public as public buildings.
 
 
 [7]
 See 118 Cong.Rec. S5942-43 (April 12, 1972), proposed S. 1819, Section 223(a)
 
 
 [8]
 See H.R. 552, 93rd Congress, 1st Session (January 30, 1973); H.R. 5020 93rd Congress, 1st Session (March 1, 1973); H.R. 5370, 93rd Congress, 1st Session (March 7, 1973)
 
 
 [9]
 The district court correctly states that "(t)he views of one Congress as to the meaning of a statute enacted by an earlier Congress are to be accorded little weight. United States v. Southwestern Cable Co., 392 U.S. 157, 170, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968)." Moorer v. Department of Housing & Urban Dev., 417 F.Supp. at 1270 n. 24. However, the significance of the later pronouncements lies in the fact they were made by the same individual who sponsored the original Act
 We also take note of the most recent attempt to amend the URA to provide benefits to individuals displaced by private institutions partially funded by federal loans or grants. On March 23, 1977, Congressman Drinan introduced H.R. 5475, a measure intended to "correct the inequities in the (URA) . . . The proposal would provide such assistance to persons displaced by private groups using Federal funds to the same extent they are covered by State displacements using Federal funds. Thus when a Federal agency awards a grant to a private organization, it would be required to include some assistance for persons forced to relocate by the acquisition of real property by the grantee." 123 Cong.Rec. E1716 (March 23, 1977) (remarks of Rep. Drinan).
 
 
 [10]
 On the floor of the House of Representatives, Congressman Hall stated that the bill "takes the rights of the individuals who are not 'willing sellers' into greater consideration and assures them of proper relocation before the right of eminent domain is enforced on them." 116 Cong.Rec. 42,507 (Dec. 18, 1970) (remarks of Rep. Hall)