**REGIONAL TRANSPORTATION DISTRICT, Petitioner,**

v.

**OUTDOOR SYSTEMS, INC., Respondent.**

No. 00SC108.

Supreme Court of Colorado, En Banc.

Nov. 13, 2001.

---

Marla L. Lien, Regional Transportation District, Associate General Counsel Denver, CO, Attorney for Petitioner.

Davis Graham & Stubbs, LLP, Richard P. Holme, Denver, CO, Attorneys for Respondent.

Chief Justice MULLARKEY delivered the Opinion of the Court.

In this case we construe the applicability of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, as amended, 42 U.S.C. sections 4601 to –55 (2001) (the Federal Act), and the Colorado Relocation Assistance and Land Acquisition Policies Act, sections 24–56–101 to –121, 7 C.R.S. (2001) (the Colorado Act) (collectively, the Acts). As relevant to this case, the Acts are applicable to certain acquisitions of real property made by state agencies and political subdivisions of the state (state agencies) for programs or projects for which federal funds will be available. *See* 42

U.S.C. § 4655 (2001); § 24–56–118, 7 C.R.S. (2001).

Here, the Regional Transportation District (RTD) terminated billboard leases held by Outdoor Systems, Inc. (Outdoor Systems) and ordered Outdoor Systems to remove its billboards from land RTD had purchased several years previously. The court of appeals, reversing the trial court, ordered RTD to compensate Outdoor Systems for the removal of the billboards, concluding that failure to provide such compensation violated the Acts. *Reg'l Transp. Dist. v. Outdoor Sys., Inc.*, 13 P.3d 806 (Colo.App.1999). The court determined that the Acts applied to this case because several years after RTD acquired the parcel, it received credit for the purchase from the Federal Transit Administration (FTA). *Id.* at 809.

■ We hold that the Acts are inapplicable to RTD's purchase of real property in an open market for land-banking purposes. RTD thus possessed the same rights as a private purchaser, including the right to terminate Outdoor System's leases according to their terms. We further hold that RTD was not required to acquire an equal interest in the billboards because it did not purchase the parcel for a project or program for which federal funding *would* become available. Thus, it owes Outdoor Systems no compensation for removing the billboards. Finally, we determine that RTD did not violate its assurances to the FTA that it would comply with the Acts.

## I.

The history of this case is as follows. In 1992, RTD commenced a Draft Environmental Impact Statement (EIS) and an Alternatives Analysis [1] to consider transit develop-

ment of the Southwest Corridor between Denver and Littleton. The agency received a $1.4 million planning grant from the FTA to assist in funding these studies.[2] RTD defined the Southwest Corridor as the area along or adjacent to Santa Fe Drive, between the Denver central business district and North Highlands Ranch Parkway to the south and north and between Wadsworth and University Boulevards to the west and east. Among the six transportation alternatives considered were: (1) improvements to the bus/high occupancy vehicle (HOV) lanes on Santa Fe Boulevard; (2) development of a dedicated busway or light rail system somewhere within the envelope of Santa Fe Boulevard and the parallel railroad tracks; or (3) development of commuter rail on the existing railroad tracks.

In January 1993, the Denver and Rio Grande Western Railroad (Rio Grande) approached RTD offering to sell, pursuant to an existing option agreement between the two, a forty-foot parcel in the existing railroad corridor parallel to Santa Fe Boulevard (the parcel). RTD and Rio Grande had entered into the option agreement in 1992 as part of a transaction in which Rio Grande reacquired land from RTD. RTD had previously purchased that land for the Central Corridor Light Rail System, a project built by RTD without federal participation. When it determined that this property would not be used in the Central Corridor project, it sold the parcel to Rio Grande.

Prior to exercising the option, RTD requested from the FTA a Letter of No Prejudice stating that RTD could receive credit for the purchase of the parcel in the event it later was used in a transit project receiving federal funding. RTD stated that it was

---

1. To comply with National Environmental Policy Act (NEPA) and its implementing regulations, an agency is required to rigorously explore in comparative form all reasonable alternatives, including a "no build" option, and to give each alternative substantial treatment in the environmental impact statement. 40 C.F.R. §§ 1502.1, 1502.14(a), 1506.1; 42 U.S.C. § 4332(2)(C)(iii) & (E) (2001). The Alternatives Analysis has been characterized as "the heart" of the environmental impact statement. *Colo. Envtl. Coalition v. Dombeck*, 185 F.3d 1162, 1174 (10th Cir.1999) (citations omitted); 40 C.F.R. §§ 1502.1,

1502.14(a). As the Administrator of the United States Mass Transportation Administration (now the Federal Transit Administration) explained, the Alternatives Analysis "initiates the Federal environmental process and leads to local decisions on how to finance the preferred alternative's capital and operating costs." (Tr. p. 57; Ex. B).

2. In November 1994 the FTA approved an additional $4.8 million for completion of the EIS and a preliminary engineering analysis.

considering alternatives for developing the Southwest Corridor in which the parcel was located but said that the purchase would not prejudice its consideration of these alternatives. The FTA informed RTD that a Letter of No Prejudice was not required to make its purchase of the parcel eligible for federal reimbursement if the project were awarded federal funds. However, it advised RTD to comply with the provisions of the Federal Act when making the acquisition to avoid the appearance that federal law was being circumvented. Further, the FTA informed RTD that reimbursement for the purchase of the parcel would be purely discretionary depending upon a review of the merits of any project in which the parcel was used, and the availability of funds at the time of the application. When RTD requested the Letter of No Prejudice it did not have a designated use for the parcel, had not decided how or whether it would proceed with the Southwest Corridor proposal, and had not yet applied for federal funding.[3]

In November 1992, Arthur Andersen & Company conducted an appraisal of the parcel, valuing the unencumbered fee simple interest in the underlying land at $7.4 million. On March 31, 1993, RTD purchased the parcel from Rio Grande for $7.5 million. As part of the transaction, Rio Grande assigned to RTD its interest in Sign License Agreements (billboard leases) that allowed for the erection and display of billboards on the parcel. Each billboard lease had a thirty-day without-cause cancellation provision.

In 1994, RTD selected light rail as the preferred alternative for the Southwest Corridor. On January 5, 1996, RTD submitted a request for a Federal Full Funding Grant Agreement (Funding Agreement) seeking FTA funding for the light rail proposal. At the time of RTD's request, the Secretary of Transportation had funds sufficient to finance only ten percent of the projects that applied for a Funding Agreement. Never-

theless, on May 9, 1996, the FTA awarded RTD a Funding Agreement for the Southwest Corridor Light Rail Project (Southwest Corridor Project).

Ultimately, RTD did not utilize the parcel in the actual Southwest Corridor Project. A preliminary engineering analysis determined that the light rail system should be built on the east side of the corridor and not on the parcel, which is located on the west side of the corridor. Consequently, RTD purchased other land from the Burlington Northern Santa Fe Railroad (Burlington Northern) on which to build the light rail system.

In order to construct the Southwest Corridor Project, however, both Burlington Northern and Rio Grande had to relocate some of their existing freight railroad tracks. RTD and Rio Grande decided to relocate Rio Grande's freight tracks onto land in the parcel. This relocation required the removal of all the billboards from the parcel. To effectuate the relocation, RTD gave notice to the billboard owners on May 28, 1996 that it was terminating the billboard leases in accordance with the thirty-day notice provision contained in the leases effective on or before June 1, 1997.[4] RTD had leased out the billboards on the parcel for approximately three years from the time that it acquired the parcel until it provided the notice of termination.

Outdoor Systems, which purchased the majority of the billboards almost one year after RTD gave notice that it was terminating the billboards leases, refused to remove its billboards from the parcel. It argued that both Acts applied to RTD's 1993 purchase of the parcel because in 1996 RTD received federal funding for the Southwest Corridor Project. Outdoor Systems contended that the Acts required RTD to acquire an ownership interest in the billboard structures at the time it purchased the parcel and that RTD owed it compensation for failing to buy such an interest.

---

3. It is not uncommon for RTD to purchase rail corridors without immediate plans for their use. Since the 1980s, RTD has acquired railroad corridors in order to preserve them for possible future developments. This "land banking" includes railroad rights-of-way in Denver along Buchtel Boulevard and 13th Avenue.

4. RTD subsequently extended this date to August 31, 1997, which was sixteen days after Outdoor Systems purchased the billboards.

In response to Outdoor System's refusal to remove its billboards, RTD brought an action in the Denver district court seeking a declaratory judgment ordering the removal of the billboards without payment of compensation. Finding in favor of RTD, the trial court issued an injunction requiring removal of the billboards. The court reasoned that RTD's termination of the lease agreements was not an acquisition within the meaning of the statutes. It stated that, by their terms, the Acts do not affect the validity of purchased property. Further, it concluded that RTD had acted in conformity with the Acts' requirement that an agency acquire an "equal interest" in all structures or improvements when it acquires "any interest in real property" because RTD had acquired the billboard leases as part of the parcel purchase.

Outdoor Systems appealed and the court of appeals reversed the trial court's judgment. It determined that RTD had violated the provisions of the Acts because it had not acquired an ownership interest in the billboards at the time it purchased the parcel. Therefore, it found that Outdoor Systems was entitled to compensation for the removal of its billboards from the parcel.

■ We granted certiorari to determine whether the Acts were applicable to RTD's purchase of the parcel and whether RTD was entitled to enforce the thirty-day termination provision of the billboard leases without paying compensation to Outdoor Systems.[5] We conclude that the Acts are not applicable to RTD's purchase of the parcel because (1) this purchase was a marketplace transaction made at a time when: (2) RTD did not know whether or how it would develop the Southwest Corridor; (3) RTD had not determined whether the parcel would be used in any transit project; and (4) there was no certain-

ty that RTD would receive federal funds for use towards the purchase. We also determine that RTD did not violate its assurances to the FTA that it would comply with the requirements of the Federal Act and that it was entitled to terminate the billboard leases according to the thirty-day notice provisions without compensating Outdoor Systems. We therefore reverse the judgment of the court of appeals and remand this case to that court with directions.

## II.

We first address whether RTD was required to follow the procedures of the Acts when it purchased the parcel from Rio Grande.

■ When interpreting a statute, we strive to effectuate the intent of the legislature. *Schoen v. Morris,* 15 P.3d 1094, 1096 (Colo.2000). To that end, we look first to the plain language of the statute. *Id.* at 1097. If the plain language is unambiguous, we need not resort to rules of statutory construction. *Id.* However, if a statute is unclear or the language is susceptible to conflicting interpretations, we may consult the relevant legislative history to discern the legislature's intent. *People v. Terry,* 791 P.2d 374, 376 (Colo.1990). When construing a statute, we attempt to give effect to the statutory scheme as a whole. *United Airlines v. Indus. Claim Appeals Office,* 993 P.2d 1152, 1157 (Colo.2000); *Meyers v. Price,* 842 P.2d 229, 231 (Colo.1992).

The Colorado Act, like its federal counterpart, is intended to provide "fair and equitable treatment [to] persons displaced by the acquisition of real property by state agencies ... for federally assisted programs and projects." § 24–56–101, 7 C.R.S. (2001). It also

5. We granted certiorari on the following issues:
(1) Whether the court of appeals erred in ruling contrary to controlling case law by this court, that a public entity acts as a condemnor even when the entity is a landlord terminating a lease according to its terms.
(2) Whether the court of appeals erred in determining that the federal Uniform Relocation Assistance and Real Property Acquisitions Policies Act of 1970, as amended, 42 U.S.C. § 4601 et seq. (1995), and the Colorado Relocation Assistance and Land Acquisition Policies Act,

C.R.S. § 24–56–101 et seq., 7 C.R.S. (2000), have retroactive application and therefore apply to property purchased by a government entity and later dedicated to a federally funded project.
(3) Whether the court of appeals erred in creating new rights in favor of respondent, and new liabilities against petitioner, even though the statutes cited by the court of appeals expressly state that they do not create new rights or liabilities.

is designed to ensure that such acquisitions comply with the Federal Act. *Id.* To further the latter goal, the Colorado Act employs language that is essentially identical to that of the Federal Act.

Nowhere do the Acts specifically define the critical term "acquisition." *See* Decisions of the Comptroller General 58–559, 561 (1979), B–192863 (noting the ambiguity created by this omission and stating that "[n]either section 305 nor any other provision of the Act specifically defines the term 'acquisition' or sets forth what type of interests in real property are covered thereby."). On its face, the word is susceptible to multiple and divergent interpretations. It connotes, for example, attainment of possession alternately via condemnation, purchase, lease, or gift. As relevant here, the language lends itself to constructions that include both willing sales of property on the market and unwilling takings by the power of eminent domain. The dictionary definition of the verb form of the term underscores its ambiguity: acquire means "to come into possession, control, or power of disposal of often by uncertain or unspecified means." *Webster's Third New International Dictionary Unabridged* 18 (1993).

■ Although the facial meaning of the term is equivocal and susceptible to varied constructions, the Acts' purpose is not. An examination of the legislative history,[6] read with attention to the structure of the Acts as a whole, persuades us that Congress and the state legislature did not intend "acquisition" to mean property purchased by the government from an owner like Rio Grande that places its property on the market of its own volition and sells without coercion. *See, e.g.,* § 24–56–101, 7 C.R.S. (2001) ("The general assembly also recognizes that the federally assisted acquisition of real property by the department of transportation and by municipalities and counties for highway programs and projects is *requiring* citizens to relocate their residences, farms, and businesses.") (emphasis added). We are persuaded that

this construction most closely comports with the intended scope of the statute.

■ The legislative history shows Congress's paramount concern about the issue of fairness. Specifically, it demonstrates that the Acts were intended to ensure that property owners disadvantaged by the state's coercive use of its superior bargaining power receive fair treatment by the government when it decides to acquire their properties for federal or federally assisted programs. *Cf. Moorer v. HUD,* 561 F.2d 175, 180 (8th Cir.1977) (reviewing the legislative history and concluding that the emphasis of the legislative hearings and reports was on involuntary or coerced acquisitions, especially via eminent domain or the threat thereof).

In the opening hearings to a predecessor bill, the relevant provisions of which ultimately were adopted as part of the Federal Act, Senator Muskie, the chief architect of the legislation, stated that the relocation and acquisition provisions were designed to "help the people and the businesses get a fair shake when the Federal bulldozer plans to move in on them." S.Rep. No. 90–1456, at 8 (1968). The following year, when the Senate resumed consideration of S.1 (which incorporated the relocation and acquisition provisions of the predecessor act), Senator Muskie reiterated the legislation's basic intent, explaining that "[t]he uprooting of an individual, his family, his business or farm, and the taking of his land is a very personal matter. We cannot make the process painless, but we can insure fair and evenhanded administration. . . ." 115 Cong. Rec. 31534 (1969); *see also id.* (containing Senator Mundt's response to Senator Muskie's remarks, in which the former restated the legislation's focus on providing "fair and just treatment for those whose home and businesses are taken for projects of the Federal Government or by State and local government with Federal financial assistance").

In the committee report accompanying the bill that was eventually enacted as the Federal Act, Senator Muskie explained that, "[i]n large part, S.1[7] is designed to permit the

---

**6.** The Colorado legislature adopted the Federal Act almost wholesale. As noted above, the language of the Colorado Act tracks that of the federal version almost verbatim. Accordingly,

we consult the federal rather than the state legislative history.

**7.** In 1971, S.1 was signed into law as the Uniform Relocation and Real Property Acquisition

Federal Government to deal consistently and fairly with all those whose property is taken for public projects and all those who are displaced from their homes and businesses." S.Rep. No. 91–488, at 2 (1969). The following year, Representative Fallon, chair of the House Committee on Public Works, submitted a report to accompany S.1. He reiterated the bill's general purpose, stating that the legislation was designed to establish "a uniform policy for the fair and equitable treatment of persons who are displaced or have their real property taken for Federal and federally assisted programs." H.R.Rep. No. 91–1656, at 1 (1970). He explained that the policies that eventually became section 4651 of the Federal Act "seek to assure that government agencies will deal fairly with owners of real property needed for Federal programs." *Id.* at 22. Stated differently, he emphasized that "[i]t is fundamental that all citizens should be dealt with fairly by their government." *Id.* at 23.

The guiding principle of fairness in coerced sales or condemnation was reaffirmed in the 1987 amendments. In the committee report accompanying the Senate's proposed amendments to the Federal Act, which ultimately became the 1987 amendments, Senator Durenberger, the legislation's chief sponsor in the Senate, reflected on the Act's purpose. He stated that it "embodies the principle that no person should be made to bear an unfair share of the cost of Federal or federally assisted programs or projects. The intent, rooted in the fifth amendment of the Constitution, is that whenever Government intrudes upon the property rights of American citizens, it assumes a collateral responsibility to take reasonable steps to restore the person to his or her former level of wellbeing." S.Rep. No. 98–71, at 2 (1983).

■ The legislative history thus evidences an unambiguous and overarching concern with ensuring that those whose property is coercively obtained or taken by the government for federal or federally assisted programs are treated fairly and equipped with sufficient rights to prevent government overreaching. By implication, the legislative history suggests that a construction of "acquisi-

tion" that reaches voluntary, arm's-length transactions would be incompatible with the statute's purpose.

The Comptroller General's interpretation of the Federal Act is consistent with this focus on and concern over fairness in coerced or involuntary transactions. A 1979 decision confirmed that "Title III of the Act, which contains the real property acquisition policies provisions, sets forth uniform and equitable nationwide procedures for the taking of real property by the Federal Government or by State agencies receiving Federal financial assistance." Decisions of the Comptroller General, *supra*, at 561. Explaining that a property owner is entitled to just compensation when its property is taken for federal projects, the Comptroller General stated that the owner is "entitled to receive the value of what he has been deprived of, and no more. To award him less would be unjust to him; to award him more would be unjust to the public." *Id.* at 564 (citations omitted).

This understanding of the Federal Act, which is informed by the legislative history cited above, warrants the conclusion that the term "acquisition" should be read to exclude marketplace transactions. Where an owner offers to sell her property and accepts a market price for it, she cannot be understood to have suffered a deprivation of the property's value. Nor is it plausible to infer that the government "intrudes" on property rights when it functions like any other buyer in the marketplace and complies with the seller's terms. Instead, understanding the Act's ambit to exclude voluntary open-market purchases is consonant with the Act's aim of "protect[ing] individual property owners from the superior negotiating position that the Federal Government or State and local Governments (for federally assisted projects) enjoy." *Id.* at 565–66.

The Department of Transportation has promulgated regulations that support this interpretation. They make clear that not every acquisition made by a state agency that ultimately wins federal funding falls within the Act's ambit. Specifically, the regulations exempt from the statute's scope voluntary

transactions that meet certain requirements.[8] 49 C.F.R. § 24.101(1) (2001). The phrasing of the regulation implies that it covers situations where an agency identifies a parcel of land needed for a particular project and then sets out to obtain it. *Cf. Shephard v. Dep't of Cmty. Corrs.*, 293 Or. 191, 646 P.2d 1322, 1329 (1982) (stating that the projects that the Acts are designed to reach are "usually site specific; that is, the governmental agency sets out to acquire certain property for the program"). Thus, the regulations contemplate situations in which the government, not a property owner like Rio Grande, is the actor. For example, the regulations address an agency undertaking a "search for ... sites" and agreeing that "no specific site needs to be acquired." 49 C.F.R. § 24.101(1) (2001). It also requires an agency to inform a property owner that the agency will not acquire its property if negotiations fail. *Id.* The regulations thus except those voluntary transactions in which an agency sets out to gain possession of a particular parcel but does not improperly leverage its superior bargaining position or threaten condemnation.

■ It would be anomalous for the regulations to exempt from the Act's strictures agency-initiated but not seller-initiated transactions.[9] The latter category, in the usual case, bears even fewer of the indicia of government pressure to sell that the Acts were designed to address. If the Acts' scope does not extend to voluntary transactions where the agency approaches the buyer wishing to obtain her property and complies with the necessary conditions, certainly it does not encompass arm's-length transactions where a property owner wishes to sell her property to the government. To conclude otherwise would be to undermine the purpose of the regulations.

■ The facts of this case make clear that the sale of the parcel was voluntary and uncoerced, and thus outside the contemplated scope of the Acts. Here, the parties entered into an agreement in which the seller "grant[ed]" to RTD an option to purchase and articulated a "desire to sell [the] property to [RTD]." Moreover, RTD's board of directors approved the sale, which the seller found favorable to it in part because of the purchaser's "qualifications and reputation." RTD's history of selling the parcel to, and repurchasing the parcel from, Rio Grande lends support to our conclusion that this acquisition was not made under threat of condemnation or pursuant to the agency's coercive exercise of its superior negotiating power. Instead, this acquisition has all of the markings of a bargained-for real estate transaction in which the seller willingly offered to sell its property. Thus, we conclude that because RTD bought property on the market for land-banking purposes, purchased the parcel from a willing seller without improperly leveraging its dominant bargaining position, and paid a market price, the statutory provisions designed to protect unwilling sellers are inapplicable.

Policy considerations also support this conclusion. If voluntary marketplace transactions were subject to the Acts, relocation benefits would be paid to a seller that placed its property on the market and fortuitously sold to a government agency that later used the property for a federally assisted project. Such a seller would receive a windfall merely because it chose to sell to a government entity rather than to a private purchaser.

---

8. Those requirements are:

 (i) No specific site or property needs to be acquired, although the Agency may limit its search for alternative sites to a general geographic area. Where an Agency wishes to purchase more than one site within a geographic area on this basis, all owners are to be treated similarly.

 (ii) The property to be acquired is not part of an intended, planned, or designated project area where all or substantially all of the property within the area is to be acquired within specified time limits.

 (iii) The Agency will not acquire the property in the event negotiations fail to result in an amicable agreement, and the owner is so informed in writing.

 (iv) The Agency will inform the owner of what it believes to be the fair market value of the property.

9. The Acts specifically instruct agencies not to force property owners to initiate inverse condemnation actions. Such transactions cannot fairly be characterized as initiated by the seller, and they are inconsistent with the voluntary transactions that we find to be outside the Acts.

Holders of limited rights on property purchased by the government similarly would reap disproportionate rewards regardless of when the purchase was made simply because a public not private landlord enforced its rights. Stripped of the incentive to proactively purchase potentially useful land that comes on the market at favorable prices in advance of particular needs, governmental agencies like RTD would forego favorable deals, ultimately raising taxpayers' costs and making eventual project development more onerous for communities.

### III.

■■■ Outdoor Systems argues that even if Rio Grande voluntarily sold the parcel to RTD, section 4652 of the Federal Act and section 118 of the Colorado Act still apply in this case because RTD provided FTA with assurances that it would comply with the Federal Act. In effect, Outdoor Systems advances an estoppel argument: it urges that even if the Acts do not apply to voluntary transactions, RTD's purchase is nevertheless subject to the Acts by dint of the promises it made to FTA. In Outdoor Systems' view, the Acts are triggered when a party affirms that it will comply with them. Because RTD made such assurances in this case, Outdoor Systems contends that RTD was required to acquire an equal interest in the billboards. The court of appeals agreed, concluding that RTD violated the twin sections of the Acts and that, as a consequence, RTD was required to recompense Outdoor Systems for the removal of its billboards. *Outdoor Sys.*, 13 P.3d at 808–09.

The Federal Act provides that a head of a federal agency will neither approve of, nor provide a grant to, any project for "which Federal financial assistance *will* be available . . . unless he receives satisfactory assurances" that the state agency in acquiring property for the project "will be guided, to the greatest extent practicable under State law," by the policies in the Federal Act. 42 U.S.C. § 4655 (2001) (emphasis added). To ensure compliance with the Federal Act, the Colorado Act expressly applies to "all acquisitions of real property by a state agency or a political subdivision of the state *for a pro-*

*gram or project* for which federal financial assistance *will be available* to pay all or any part of the cost of the program or project." § 24–56–121, 7 C.R.S. (2001) (emphasis added). Section 118 of the Colorado Act, which is at issue here and which is substantially the same as section 4652 of the Federal Act, provides:

Where any interest in real property is acquired *for a program or project for which federal assistance will be available* to pay all or any part of the cost of the program or project, the acquiring agency shall acquire an equal interest in all buildings, structures, or other improvements located upon the real property so acquired which are required to be removed from such real property or which the head of the acquiring agency determines will be adversely affected by the use to which such real property will be put.

(Emphasis added.)

Even assuming, arguendo, that RTD's assurances triggered the Acts and that Outdoor Systems could enforce such assurances, we conclude, based on a textual analysis, that RTD's purchase of the parcel did not violate them. As a threshold matter, an agency must acquire property for "a program or project for which federal financial assistance will be available," before it becomes obligated to obtain an equal interest in any structures or improvements thereon. In this case, the parcel was not purchased "for a program or project" for which federal funds *would* be available. We determine, therefore, that RTD was not required to acquire an equal interest in the billboards and thus owes Outdoor Systems no compensation for removing them. Thus, RTD did not contravene its promises to the FTA that it would abide by the strictures of the Acts.

■■■ Whether federal funds "will be available" for a project must be decided as of the time when the property is acquired. Several facts make it clear that this criterion was not met when this purchase was made.

The NEPA process prohibits an agency engaged in planning studies from selecting an option before each alternative, including a "no build" or "no action" option, is given

rigorous consideration. 42 U.S.C. §§ 4332 (2001); 40 C.F.R. §§ 1502.1, 1502.14(d), 1506.1 (2001). Compliance with that law thus precludes an agency from developing a project until the planning process concludes. Similarly, Colorado law prescribes an authorization process that the Denver Regional Council of Governments (DRCOG) and the RTD Board must follow before it can take any action on a transit proposal. § 32–9–107.7, 9 C.R.S. (2001). In this case, RTD purchased the parcel in 1993, in the midst of the planning process, when it was uncertain that any project would develop. DRCOG and the RTD Board had not yet gone through the authorization process, and thus had no legal authority to proceed on any proposed transit development. The light rail alternative was selected in 1994, at which time the planning process ripened into a project. The project took on a federal cast only in 1996 after the Funding Agreement was awarded.

 This understanding of what constitutes "for a program or project" is consonant with the United States Supreme Court's construction of that phrase in *Alexander v. HUD*, 441 U.S. 39, 99 S.Ct. 1572, 60 L.Ed.2d 28 (1979). There the court adduced the meaning of the phrase in the context of determining who qualifies as a "displaced person" [10] under the first chapter of the Acts, which addresses relocation assistance.[11] It considered whether the written order clause [12] encompassed tenants required to vacate their apartments in a low-to middle-class housing project even though the Department of Housing and Urban Development's (HUD) orders to vacate were not motivated by a governmental acquisition of property or to further a public program or project. *Id.* at 42–43, 99 S.Ct. 1572. The Court concluded that the clause included only those persons ordered to vacate in connection with the actual or proposed acquisition of property for a federal program. *Id.* at 46, 99 S.Ct. 1572. The Court explained:

> In essence, the clause embodies two causal requirements. First, the written order to vacate must result *directly* from an actual or contemplated property acquisition. Second, and more fundamentally, *that acquisition must be "for," or intended to further, a federal program or project.* In combination, these two causal requirements substantially limit applicability of

10. Some courts have concluded that in order to trigger either chapter of the statute, one first must qualify as a displaced person under the Acts. *See, e.g., Ackerley Communications v. Mt. Hood Cnty. Coll.,* 51 Or.App. 801, 627 P.2d 487, 489 (Or.1981). Under the facts of this case, it is uncertain whether Outdoor Systems would so qualify. First, at least one federal court has suggested that one who moves as a result of a landlord's decision to terminate a lease, rather than as a result of a notice of intent to acquire or actual acquisition, under circumstances where the government has owned the property for a period of time, cannot be considered displaced by acquisition and thus does not qualify as a displaced person. *Lake Park Home Owners' Ass'n v. HUD,* 443 F.Supp. 6, 9 (S.D.Ohio 1976). Second, the Code of Federal Regulations implementing the Federal Act states that one, like Outdoor Systems, who enters into occupancy of property after it has been acquired for a project does not qualify as a displaced person. 49 C.F.R. § 24.2. However, because the parties did not argue these points, and because RTD did not challenge this designation, we assume without deciding that Outdoor Systems was a displaced person.

11. Section 24–56–102(2)(I)(A) of the Colorado Act defines a displaced person as "[a]ny person who moves from real property or moves his personal property from real property ... [a]s a direct result of a · written notice of intent to acquire or the acquisition of such real property in whole or in part for a program or project undertaken by a displacing agency." § 24–56–102(2)(I)(A), 7 C.R.S. (2001). The Federal Act's language is nearly identical; it substitutes the phrase "displacing agency" with "by a Federal agency or with federal financial assistance." 42 U.S.C. § 4601. These clauses have been referred to as the "written order" clauses.

12. Section 4601 of the Federal Act defines displaced person as any person who moves as a direct result of the acquisition of real property or as a result of the written order of the acquiring agency to vacate real property for a Federal or federally assisted project or program. Amendments to the Federal Act, passed in 1987, effected changes to the statute. The changes were designed to broaden coverage, raise assistance levels, reduce or eliminate windfall payments and abuses, and rectify "burdensome and inefficient procedures mandated in the act." Sen. Rep. No 98–71 at 2,4, (1982). The changes to the written order clause do not affect the Supreme Court's analysis.

the written order clause, so that persons directed to vacate property for a federal program cannot obtain relocation assistance unless the agency also intended *at the time of acquisition* to use property for such a program or project. Thus, *a program developed after the agency procures property will not suffice, even though it necessitates displacements, since that program could not have motivated the property acquisition.*

*Id.* (footnotes omitted; emphases added).

The sections of the Acts directly at issue here employ the identical "for a program or project" phrasing. Although we examine the acquisition chapter, not the relocation one, we conclude that the *Alexander* analysis applies equally here since there is no indication that Congress intended the phrase to bear two different meanings in the same statutory scheme. Applying the Supreme Court's statutory analysis from *Alexander*, we conclude that the parcel was not purchased "for a program or project." At the time of the purchase, RTD did not know if it would be practicable to develop a light rail system in the Southwest Corridor or if later analyses would instead reveal that a no-build alternative was preferable. At that time it could only speculate as to whether the parcel would be used in the proposed Southwest Corridor. (As discussed above, RTD did not use the parcel in the actual Southwest Corridor Project; Rio Grande eventually used the parcel for the relocation of its tracks.) Instead, RTD purchased the parcel in accordance with its practice of land banking and in the hopes that it might later prove useful. Consequently, in this case, the acquisition cannot be described as being made "for" or to further a program.

Our conclusion, that the Acts exclude this transaction because it fails to qualify as a program or project, is supported by our concomitant determination that the purchase can not be characterized as one made for a program "for which federal funds *will* be available."

■ The Department of Transportation's regulations implementing the Federal Act define program or project to mean "any activity or series of activities undertaken by a federal agency *or with federal financial assistance received or anticipated* in any phase of an undertaking in accordance with the Federal funding agency guidelines." 49 C.F.R. § 24.2 (2001) (emphasis added). In this case, RTD purchased the parcel at a time when it had received no federal financial assistance for the undertaking with the exception of funds dedicated to performing an EIS and Alternatives Analysis. The use of federal funds for planning activities does not make a proposal federal in nature. *Vill. of Los Ranchos de Albuquerque v. Barnhart*, 906 F.2d 1477, 1481–82 (10th Cir.1990) (concluding that federal funding of an EIS was not sufficient to make the project federal or to trigger federal environmental laws); *Atlanta Coalition on the Transp. Crisis, Inc. v. Atlanta Reg'l Comm'n*, 599 F.2d 1333, 1347 (5th Cir.1979) (stating that "federal financial assistance to the planning process in no way implies a commitment by any federal agency to fund any transportation project or projects."); *see also Macht v. Skinner*, 916 F.2d 13, 17 (D.C.Cir.1990) (same). At the time of purchase, RTD probably had hope for future federal funding but had no information confirming that such funding would be forthcoming. Indeed, only a very small percentage of proposed projects were funded nationwide.

■ Further, both Acts use the word "will" in defining their scope. Plainly, the meaning of "will" is mandatory rather than hortatory. *See Burnell v. Smith*, 122 Misc.2d 342, 471 N.Y.S.2d 493, 496 (N.Y.Sup.Ct.1984) ("[T]he word 'will' is defined as '[an] auxiliary verb commonly having the mandatory sense of 'shall' or 'must'. . . . It is a word of certainty, while the word 'may' is one of speculation and uncertainty'.") (alterations in original) (quoting *Black's Law Dictionary* 1771 (4th ed.1951)); *see also Milner v. Dudrey*, 77 Nev. 256, 362 P.2d 439, 443 (1961); *McElroy v. Luster*, 254 S.W.2d 893, 896 (Tex.Civ.App. 1953).

In this case, there was no certainty that RTD would be awarded federal funds for the project. When RTD asked the FTA for a Letter of No Prejudice, the FTA explained that "there is no federal interest" in the

value of the parcel. The FTA also stated that if RTD decided to use the parcel in a project and requested federal reimbursement for the acquisition, the FTA would have to weigh the merits of the project, the available supply of discretionary funds, and the demands of other meritorious projects. As explained above, the planning grant that RTD received to perform the EIS and Alternatives Analysis in no way implied a commitment by the FTA or any other agency to fund the project. *See Macht,* 916 F.2d at 17. Thus, the FTA's language indicates that it was uncertain at the time of purchase that RTD would receive federal funding for its purchase of the parcel.

We conclude that by its plain language, section 24–56–121, which governs the applicability of the Colorado Act, does not apply to this transaction. We further conclude that RTD violated neither section 4652 of the Federal Act nor section 118 of the State Act, and thus acted in accordance with its assurances to the FTA. This conclusion is supported by the fact that in November 1997, after RTD was granted an injunction for removal of the billboards, the FTA, which was aware of the injunction, found that RTD was in compliance with federal law and that the Southwest Corridor Project was eligible for federal funding.

Because we conclude that the Acts were not applicable to RTD's purchase of the parcel and that RTD complied with its assurances to the FTA, we also conclude, a fortiori, that RTD was not required to acquire an ownership interest in the billboards at the time it bought the parcel.

### IV.

■■■■ We next consider whether RTD was entitled to terminate the billboard leases according to the thirty-day notice provision.

Because we have determined that the Acts do not apply, we look to this court's precedent. This court has addressed this issue before. In *Petry v. City & County of Denver,* Denver purchased real property from the Colorado and Southern Railway Company (Southern Railway). 123 Colo. 509, 233 P.2d 867 (1951). Southern Railway assigned Denver a lease as part of the purchase. Denver acted as landlord of the property for four years before terminating the lease according to its thirty-day termination provision in order to use the property for a public purpose. *Id.* at 510–11, 233 P.2d at 867. The tenant had erected structures on the property pursuant to the lease and refused to vacate, maintaining that Denver was required to acquire its interest through condemnation. *Id.* at 512, 233 P.2d at 868.

This court determined that Denver was "not proceeding as a condemnor of property in which the landlord and tenant each have an interest, but as the owner of real estate subject to a lease terminable at will on thirty days notice." *Id.* at 514–15, 233 P.2d at 869. Stating that Denver should not be treated differently from any other property owner, this court deemed irrelevant the fact that the tenant's lease was terminated so that Denver could use the property for a public purpose. *Id.* at 515, 233 P.2d at 869.

The *Petry* analysis applies to this case. RTD purchased the parcel in an open market transaction intending to hold it as a landowner with the possibility of using it in future transit projects. RTD acted as a landlord for almost four years until it decided to terminate the billboard leases according to the 30–day termination provision. As a landowner and not a condemnor, RTD was entitled to enforce this provision without paying compensation to Outdoor Systems. *See id.* at 516, 233 P.2d at 870 (citing to Justice Holmes's opinion in *Emerson v. City of Somerville,* 166 Mass. 115, 44 N.E. 110, 112 (1896), a case in which the city accepted a private offer to purchase land and subsequently gave notice to a tenant to vacate, and quoting from that opinion: "[Petitioner's] occupancy has ended after an allowance of all the time to which, in any aspect, he was entitled. That is all. Surely this is not something for which the city must indemnify him."). Acting as a market buyer, RTD possessed the same rights, including the right to enforce the leases on the property, which any other market buyer would have. *See United States v. Blumenthal,* 315 F.2d 351, 354 (3d Cir.1963) (stating that the government, "which is here acting in its proprie-

tary rather than its governmental capacity, has the same absolute right as any other landlord to terminate a monthly lease by giving appropriate notice and to recover possession.... These were the risks which the defendant took when he established his business in a building on which he had only a month-to-month lease. He must, therefore, bear the consequences to him of the lawful termination of that lease. [The Government] has no duty to provide him with a permanent place in which to carry on his business."). We therefore conclude that the termination of the billboard leases was not a taking that required compensation.

### V.

Because we determine that the court of appeals erred and the provisions of the Acts are not applicable to the acquisition and that RTD did not violate its assurance to abide by the Federal Act, we decline to address the third issue presented for review.

### VI.

We conclude that: (1) the Acts were not applicable to RTD's purchase of the parcel; (2) RTD, as owner of the parcel, was entitled to enforce the thirty-day termination provision in the billboard leases; and (3) RTD complied with its assurances to the FTA that it would follow the provisions of the Federal Act. Therefore, we reverse the judgment of the court of appeals and remand this case with directions to return it to the district court for proceedings consistent with this opinion.